**Opinion issued May 26, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-01095-CV

————————————

## IN RE K.P., A MINOR CHILD,

———————————————————————————

## On Appeal from the 314th District Court
## Harris County, Texas
## Trial Court Case No. 2011-00785J

———————————————————————————

## O P I N I O N

This is an accelerated appeal of a December 3, 2015 judgment terminating Mother's parental rights to KP, her 12-year-old son. On March 29, 2012, the trial court denied an earlier petition to terminate Mother's parental rights to KP and instead named the Department of Public and Protective Services (referred here throughout as "Department" or "DFPS") as sole managing conservator and Mother

as possessory conservator. After the underlying November 2015 trial that is the subject of this appeal, the court found that circumstances have materially and substantially changed since the prior order denying termination was entered and entered a judgment on December 3, 2015, continuing the Department as sole managing conservator and terminating Mother's parental rights. We affirm.

## TRIAL PROCEEDINGS AND EVIDENCE – TERMINATION TRIAL

Several exhibits were introduced at the beginning of the November 2015 trial that provide background about the case. One establishes, through DNA testing, that the only person identified as potentially being KP's father was not his father. Mother testified at trial that she did not know who else might be the father, and a search of the Paternity Registry did not reveal any notice of intent to claim paternity of KP.

### A. Documents related to the 2012 Proceedings

A February 2, 2011 affidavit in support of KP's removal was entered into evidence at the 2015 trial. It indicated that KP was, at that time, residing in a medical facility, and that the Department had been unable to ascertain where, and with whom, KP had lived the previous five years. It listed the following as "Facts Necessitating Removal of the Child":

> On September 15, 2009, the Department of Family and Protective Services received a referral alleging physical abuse of 7 year old, [KY] (DOB 5/31/02) by the mother, []. The report indicated [KY] was hospitalized for a psychiatric evaluation, because she

2

attempted to assault the mother, []. During the course of the investigation, [KY] disclosed that she was spanked by her mother, [], resulting in bruising on her lower back and upper buttocks. The mother [] indicated she has a diagnosis of Bipolar Disorder and Depression, and there were concerns of domestic violence between the mother, [] and the step-father, [JL]. The case disposition was ruled out, however risk indicated, and the case was transferred to Family Based Safety Services.

([KP], the child the subject of this suit, was not mentioned in the September 15, 2009 referral.)

The parents, [Mother] and the step-father, [JL] were asked to participate in parenting classes and domestic violence counseling. [Mother] was also asked to complete a psychological evaluation and follow the recommendations from the evaluation. [Mother] and [JL] both completed parenting classes and domestic violence classes; however [Mother] refused to cooperate with a psychological assessment.

In December 2010, the mother, [] and [step]father, [JL] were involved in a domestic dispute resulting in [JL] being arrested and charged with Assault Causing Bodily Injury to a Family Member, and [Mother] moved into a Shelter in Galveston County with two of her children, [KP] (D.O.B. 8/22/03) and [KY]. The third child, [EL] (D.O.B. 11/2/07) was left in the care of a family member. [Mother] was discharged from the shelter after [KP] started a fire in a trash can at the shelter.

On 01/14/11, [KY] was voluntarily placed with the paternal grandmother, [KM].

On 01/14/11, [KP] was hospitalized at Intra-Care Hospital as he was believed to be a threat to himself and others. [KP] has been diagnosis with Mood Disorder and ADHD.

On 01/27/11, [EL] (age 3) was voluntary placed in the home with the maternal great aunt, [DS].

On 02/2/11, the mother, [] indicated KP will be discharged from Intra-Care Hospital and does not have a place for [KP] to reside. [Mother] indicated she was residing with relatives; however she is no longer able to reside with relatives, and she is currently living in a Motel. [Mother] indicated she was planning to move into a new

3

apartment on 2/1/11; however she was unable to secure the apartment. [Mother] previously self disclosed that she has been diagnosed with Bipolar Disorder and Depression. She is currently not on any medication for her diagnosis and is not under the direct care of a psychiatrist currently.

. . . .

CPS History

09/27/05 Allegations of Physical Abuse to [KP] and [KY] by [Mother] and [JL]-Disposition Unable to Determine.

09/27/05 Allegations of Physical Neglect to [KY] by [Mother]. Disposition- Ruled Out.

02/18/09 Allegations of Neglectful Supervision to [KP] and [KY] by [Mother], [ML] (Maternal Grandfather), and, [RL](Maternal Great Uncle)-Disposition Ruled Out.

02/18/09 Allegations of Physical Abuse to [KP] and [KY] by [Mother]- Disposition Ruled Out.

02/18/09 Allegations of Physical Neglect to [KP] and [KY] by the mother, [].- Disposition Ruled Out.

12/10/10-Allegations of Neglectful Supervision to [KP] and [KY] by [Mother]-Disposition Ruled Out

12/10/10-Allegations of Physical Abuse to [KP] and [KY] by [Mother]-Disposition Ruled Out

12/10/10- Allegations of Sexual Abuse to [KY] and [KP] by [Mother] and Unknown l-Disposition Ruled Out.

12/10/10-Allegations of Sexual Abuse to [KY] by [GH] (maternal cousin). Disposition- Ruled Out.

The whereabouts and identity of [KP]'s father is currently unknown.

Removal from the home is in the best interests of the child [KP] because the mother indicated she is unable to care to the child, the mother does not have stable housing or employment and cannot meet the basic needs of the child, the mother has mental health concerns which are not being treated, and for all the additional reasons stated

above. The Texas Department of Family and Protective Services is requesting to be appointed Temporary Managing Conservator of [KP].

On March 31, 2011, the court held a status hearing, at which the Department proposed a service plan. The proposed service plan listed the Department's concerns, "as of 3/3/11":

[Mother] did not complete FBSS services and currently has no place to live and no means of caring for [KP].

There is considerable CPS history with this family.

[Mother] currently does not have a home for [KP] to come home to.

[Mother] was previously in a domestic violence relationship.

Mother's location is currently unknown and the step-father is refusing to accept responsibility for his actions.

Neither parent has been cooperating with the agency.

Mother is not willing or able to provide a safe or stable environment for [KP].

Mother did not show up for the hearing, so the record reflects that the proposed service plan had not been shown to her or explained to her; thus, there was no agreement as to services.[1] A permanency hearing was date was set for July 11, 2011.

The March 29, 2012 judgment was also introduced as an exhibit in underlying trial 2015 termination trial. In that prior 2012 order, the court found that it was in the best interest of KP for DFPS to be designated as his Sole Managing Conservator. The court found it in KP's best interest for Mother to be

---

[1] There were later service plans in place that the Mother and the Department agreed to, but Mother apparently did not complete them.

5

appointed possessory conservator, and that "the limited possession and access provided by this order is required, and does not exceed the restrictions needed to protect the child." The order allowed Mother access to KP only in supervised visits.

**B. The September 22, 2015 CASA Status Report**

KP's guardian ad litem prepared a report dated September 22, 2015 recommending that the Department be granted Permanent Managing Conservatorship of [KP] and that Mother's rights be terminated. The report cited the Department's four requests, spanning from 2011 to 2014, for Mother to complete a plan of service, which Mother never completed. The report noted that Mother has not maintained regular contact with the Department, and has not followed through on important visits for KP, leaving him to feel abandoned. Specifically, the report states that Mother's "lack of attentiveness and participation has led to [KP] being emotionally and psychologically disturbed." The report also notes that KP's therapist requested that parental visits be stopped after Mother and her boyfriend tested positive for cocaine in drug tests on December 19, 2014, and March 19, 2015.

The report further recommended that KP remain in his current therapeutic foster home placement, where he has resided since August 17, 2015. His needs are being met educationally, physically, and emotionally. KP suffers from depression,

ADHD, and Bipolar Disorder.  He is in therapy.  KP wants to be returned to his Mother.  Although the original goal was family reunification, then long-term facility placement, KP's guardian ad litem reported that KP's therapist of three years has explained that Mother's "inconsistencies in contacts and visits have been traumatic for him" and the therapist's "paramount concern is for [KP] to have stability and consistency."  The Guardian Ad Litem has been on this case since 2011, the year the Department was granted Temporary Managing Conservatorship. In preparing the CASA report, the ad litem reviewed the following records: the Department's file, Drug Test results, Physiological and Psychiatric Evaluations, School Records, and Therapy Notes.

### C. Mother's testimony

At the underlying trial, Mother testified that CPS first sought removal of her son, KP, from her care several years ago.  She acknowledged that she has tested positive for drugs since the prior termination proceedings, but stated that the positive drug test results were incorrect.  When asked for the basis of that conclusion, she stated that the allegedly false drug test results were related to her HIV status, her type 2 diabetes, and her being in and out of the hospital for "chronic pain and sickness."

She conceded that she does not have a prescription for cocaine or marihuana, nor was she given these substances at the hospital, although she had tested positive

7

for both substances in her system. She admitted to having done cocaine and smoked marihuana before, and to testing positive for marihuana on March 15, 2015.

Mother also testified that, at the time of trial, she had worked for In-Home Health Care for about nine months, and that she is ready to get KP back. He has not lived with her since 2011; he has been in CPS's custody. She has no idea who KP's father might be. Mother's 13-year-old daughter, KY, has also been the subject of a past case and has lived with Mother since 2009.[2]

She identified TR as her fiancé. She stated that he does not use drugs either. She acknowledged that TR tested positive for cocaine and marihuana in March 2015. She opined that all of TR's failed drug tests since the prior termination proceedings were wrong. When asked, "So, he's never used cocaine?," she responded with "I'm not going to say never, but he has not used drugs at this current time." She testified that, if KP was returned to her possession, she would be living with TR as well.

Mother agreed that it is not good to do drugs such as cocaine and marihuana around a child, but insisted that fact is irrelevant here, as she and TR do not do drugs. She acknowledged that she tested positive for cocaine and marihuana drug use during an earlier CPS case involving a different child, KY, but maintained that

---

[2]      It is not clear from this record where KY lived prior to 2010. The Department is actively trying to remove KY from Mother's care.

those tests were wrong as well. In sum, she stated that any test indicating that she has done drugs after 2009 is incorrect.

### D. KP's CPS caseworker

M. Youngblood, KP's caseworker, testified that KP is currently in a very caring foster home. Youngblood stated that the Department wanted to terminate Mother's parental rights because of her use of cocaine and not following through on required services. Youngblood asked her to take parenting classes, substance-abuse counseling, and individual counseling. She testified that Mother never completed anything.

Youngblood was asked why Mother's 13-year-old daughter, KY, was permitted to remain in the home with her mom testing positive for cocaine. She explained the challenges the Department has faced in seeking KY's removal:

> Well, she's – there's been a lot of uptakes on that, and there have been a lot of investigations trying to get K[Y]. They went to school. K[Y] will not talk. She would not give the correct address on where she lives. She said she lives in Fort Bend, but she told me when she came to my office she lives in a motel. The intake that was presently done about a month ago said she is in her car. So, it's kind of hard for an investigator to follow through on getting K[Y].

Youngblood explained that, over the years, the Department has tried to do much to reunite Mother with KP. She unfortunately continuously either refused to submit to drug tests or tested positive for drug use in 2013 and 2015.

Youngblood testified that "the Agency's position [is] that by engaging in drug use, illegal drug use during the course of this case, that [Mother] engaged in conduct which endangered the physical and emotional well-being of [KP]," which she asserts are sufficient grounds for termination under section 161.001(b)(1)(E). She further testified that the Department made reasonable efforts to return KP to Mother, and that Mother did not make an effort to regularly visit or maintain significant contact with KP. Youngblood opined that Mother has "demonstrated an inability to provide [KP] with a safe and stable environment" and stated that Mother did not comply with conditions she was told were necessary to obtain return of KP.

Youngblood also opined that it is not in KP's best interest to be returned to his mother because there are concerns "that she's taking drugs around the child and trying to still supervise the child under the influence of drugs." The agency has concerns about her ability to parent, and also believe it is in KP's best interest that Mother's parental rights be terminated so KP can eventually hopefully be adopted by a family. One of the Department's goals is for KP to achieve permanency. KP has exhibited behavioral issues in his placements, has had issues with other children at school, and he "responds poorly when he's not in [a] structured environment."

Mother has not demonstrated to Youngblood that she is "capable at all of providing a structured environment for KP." Youngblood presumes that Mother moves around a lot, because she has not once—through the entire case—demonstrated that she has a residence. That fact, coupled with KY telling investigators "about different places she lived including a car in Fort Bend and other places" leads the Department to believe that she cannot provide KP a residence, much less a safe and stable residence. Youngblood opined that "Mother's unstable home environment" was another reason that termination of parental rights is in KP's best interest because he has demonstrated that he "requires a very stable, structured environment to thrive." She testified that, at this point, KP is very psychologically unstable, suffering emotionally from the uncertainty in his life, and acts out violently in response to instability.

On cross-examination, Youngblood clarified that she had only been assigned to the case for about one year, since December 2014. The only time she personally called Mother to do a random drug test was in January or February 2015, and Mother did not show up. Otherwise Youngblood was just focused on trying to get Mother to perform her services, but Mother did complain to Youngblood that she was not asking her to take random drug tests more often. Youngblood testified that Mother never called her — it was almost always Youngblood who reached out to communicate.

Youngblood was also cross-examined about documents reflecting different drug test results. The following exhibits related to these tests were admitted into evidence:

- January 18, 2013 – Mother's hair sample tested positive for Benzoylecgonine: 2208/pg/mg; and Cocaine 619 pg/mg

- March 8, 2013 – Mother's hair sample tested positive for marihuana: 0.27 pg/mg

- March 21, 2013 – Mother's urine sample tested negative; Mother's hair sample tested positive for marihuana: >50.0; and marihuana metabolite 0.2 pg/mg

- May 14, 2013 – Mother's hair sample and urine sample both tested negative

- August 27, 2013 – Mother's urine sample tested negative; Mother's hair sample tested positive for Benzoylecgonine: 256 pg/mg; and Cocaine: 645 pg/mg

- December 12, 2013 – Mother's urine sample tested negative

- March 21, 2014 – Mother's urine sample tested negative

- June 18, 2014 – Mother's urine sample tested negative

- December 19, 2014 – Mother's urine sample tested negative; Mother's hair sample tested positive for Benzoylecgonine: 547 pg/mg; and Cocaine: 1806 pg/mg

- March 19, 2015 – Mother's urine sample tested negative; Mother's hair sample tested positive for Benzoylecgonine 319 pg/mg; and Cocaine: 1535 pg/mg

March 19, 2015 drug testing results for Mother's fiancé, TR, were also entered into evidence, reflecting a negative urine test and a positive hair test for Benzoylecgonine, Cocaine, and Marihuana.[3]

---

[3]     TR's criminal record was also entered into evidence, reflecting convictions in 2000 for evading arrest, in 2001 for unauthorized use of a motor vehicle and

12

When asked why the Department was seeking now to terminate parental rights, i.e., what were the "changes in circumstances" since the 2012 order appointing mother as possessory conservator, Youngblood testified it was (1) Mother's testing positive for cocaine, and (2) her failure to contact the Department or work on services. She acknowledged that Mother did sometimes visit KP before a court order was sought prohibiting contact after one of Mother's failed drug tests.

Youngblood testified that the Department was waiting to seek a permanent adoptive placement until Mother's parental rights were terminated. The Department filed a petition for termination in March of 2015, but were still hoping to give Mother a chance. In September 2015, when Mother's stopped cooperating with or attending appointments with the therapist that the Department lined her up with that the final decision was made to pursue a termination hearing.

Finally, Youngblood explained that parental termination would open up KP for adoption broadcasting in the entire United States, not just Texas.

### E. Guardian Ad Litem's Testimony

An advocacy coordinator, Q. Smith, testified that Child Advocates has been appointed as the guardian ad litem for KP, and that its position is that it is in KP's best interest to have parental rights terminated because:

---

burglary of a habitation with intent to commit theft, and in 2009 for felony possession of a weapon,

Due to the positive drug tests that the mother's had throughout the case, failed to complete family plan of service, unstable home environment, failure to maintain contact with the caseworker, and also reflect missed visits with [KP]. [KP] is emotionally fragile and the ups and downs that he's gone through with this case.

## THE TRIAL COURT'S JUDGMENT

When the Department attempted to offer Mother's latest service plan at the pre-trial hearing for use in demonstrating that Mother's parental rights should be terminated under Texas Family Code 161.001(b)(1)(o) (permitting involuntary termination of parental rights if the court finds, by clear and convincing evidence, the parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child"), it realized, in response to an objection by Mother's counsel, that there was actually no court ordered service plan in effect, and conceded that it could not seek termination on that ground:

> [MOTHER'S COUNSEL]: And, Judge, again, that's an order. It -- that was issued in the prior case. There was a final order issued. So that clearly isn't relevant to any issue in this case. And if the purpose of it is to try to show (o) then -- then, clearly it's not admissible because the Court rejected the termination in the 2012.
>
> . . . .

14

Just to show for (o), you need a current order that tells a parent what they have to do in order to be reunified with their child; and you can't use old orders that were already subsumed in a final decree.

THE COURT: What are your intentions?

[DFPS'S COUNSEL]: Judge, with respect to the (o) grounds, I'm actually going to need it, but the decree normally provides that any prior temporary orders shall continue in effect and the argument is that that includes family service plan. We're currently looking at the decree. I will have to withdraw the objection because I do not see the specific language in this old decree that says the prior temporary orders are to continue in effect. So . . . .

THE COURT: So, you're withdrawing 7 [the family service plan]?

[DFPS'S COUNSEL]: Yes.

THE COURT: All right.

[DFPS'S COUNSEL]: I'm not withdrawing it, Judge. I'm just saying I'm not going to have grounds to terminate her on the family service plan, which I'm okay with.

THE COURT: Okay. I'm going to go ahead and sustain [Mother's counsel]'s objection to 7.

After the close of the evidence, the trial court entered judgment continuing DFPS as KP's Managing Conservator, and terminating Mother's parental rights under two different sections of the Texas Family Code:

*Texas Family Code § 161.004*:

**Termination After Prior Termination Denied**

The Court finds that some of the evidence considered in this trial related to events occurring before a prior order denying termination, and that such evidence was admissible pursuant to § 161.004, Texas Family Code.

15

The Court finds by clear and convincing evidence that the petition for termination in this case was filed after the date that an order denying termination of the parent-child relationship of [Mother] was rendered, that the circumstances of the children, parent, sole managing conservator, possessory conservator, or other party affected by the prior order have materially and substantially changed since the prior order was rendered, and that, before the prior order was rendered, said parent committed an act listed under § 161.001, Texas Family Code.

*Texas Family Code § 161.001(e)*:

### Termination of Respondent Mother[]'s Parental Rights

The Court finds by clear and convincing evidence that termination of the parent-child relationship between [Mother] and the child [KP], the subject of this suit is in the child's best interest.

Further, the Court finds by clear and convincing evidence that [Mother] has:

Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(1)(E), Texas Family Code.

### ISSUES ON APPEAL

Mother raises the following three issues on appeal:

1. "Was the evidence legally and factually sufficient to support the termination of appellant's parental rights under §161.001(1)(E)?"

2. "Was the evidence legally and factually sufficient to support the termination finding on best interest grounds?"

3. "Was the evidence legally and factually sufficient to support the removal of appellant as the child's possessory conservator?"

16

**STANDARD OF REVIEW FOR TERMINATION OF PARENTAL RIGHTS**

Because parental-rights termination "is complete, final, irrevocable, and divests for all time that natural right[,] . . . the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1980)). Clear and convincing evidence "means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). This heightened burden of proof results in a heightened standard of review.

When determining legal sufficiency, we review "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id*. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*. This does not mean that we must disregard all evidence that does not support the finding. *Id*. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

17

*Id*. Therefore, in conducting a legal-sufficiency review in a parental-rights-termination case, we must consider all of the evidence, not only that which favors the verdict. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining factual sufficiency under the clear-and-convincing burden, we must consider whether the evidence is sufficient to produce a firm belief or conviction in the mind of the factfinder as to the truth of the allegation sought to be established. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The natural rights that exist between parents and their children are of constitutional dimension. *Holick*, 685 S.W.2d at 20. Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26. For

parental rights to be involuntarily terminated, it must be found by clear and convincing evidence that the parent engaged in conduct set out in subsection 161.001(1) and that termination would be in the child's best interest pursuant to subsection 161.001(2). TEX. FAM. CODE ANN. § 161.001 (West 2014). Both elements must be established, and termination may not be based solely on the factfinder's determination of best interest of the child. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re L.M.*, 104 S.W.3d 642, 646 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

## CAN TERMINATION BE AFFIRMED UNDER SECTION 161.004?

As a preliminary matter, we must determine if the trial court's reliance on section 161.004 of the Texas Family Code can support its judgment terminating parental rights, given that this section was not pleaded by the Department, and the Department itself concedes that it was not seeking termination under this section at trial.

Section 161.004, which allows the trial court to terminate parental rights after a prior denial of a termination petition if (1) "the circumstances . . . have materially or substantially changed since the date the [prior] order was rendered," (2) the parent committed a violation under section 161.001 before the prior order, and (3) termination is in the child's best interest:

19

**§ 161.004. Termination of Parental Rights After Denial of Prior Petition to Terminate**

(a) The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:

> (1) the petition under this section is filed after the date the order denying termination was rendered;
>
> (2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;
>
> (3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and
>
> (4) termination is in the best interest of the child.

(b) At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

TEX. FAM. CODE ANN. § 161.004 (West 2014).

The Department urges us to affirm the trial court's judgment under section 161.004, and points out that "it is unknown from the decree what act under Section 161.001 the court found the mother committed before the prior decree for its finding . . . under Section 161.004." But, it argues, "the evidence conclusively establishes that the mother committed the act of Subsection O before the entry of the prior decree. Consequently, with the other findings under Section 161.004, the judgment for parental termination may be affirmed with a finding that termination is in the child's best interest, without considering the court's general finding for

20

parental termination under Section 161.001 of the Texas Family Code." It further asserts that "even though the Department did not ask for judgment for parental termination under Section 161.004," the trial court was authorized—under section 161.206(a)—to terminate under that section because section 161.206(a) affirmatively imposes upon trial judgment the independent duty to decide whether a parental termination judgment must be ordered by stating "(a) If the court finds by clear and convincing evidence grounds for termination of the parent-child relationship, it shall render an order terminating the parent-child relationship."

We disagree with the Department that the trial court's termination of Mother's parental rights can be affirmed under section 161.004 of the Texas Family Court on the theory that the trial court "could have" based its termination on Mother's pre-2012 failure to follow the pre-2012 service plan (i.e., under section 161.004(b)(1)(o) permitting termination for failure to complete service plan).

Termination can be achieved after a prior order denying termination through either section 161.004 or section 161.001. *In re K.G.*, 350 S.W.3d 338, 350–52 (Tex. App.—Fort Worth 2011, pet. denied). When the Department does not plead section 161.004 as grounds for termination, it is error to admit evidence from before a prior decree denying termination. *Id*.

21

Here, (1) the Department did not plead section 161.004 as a grounds for termination, (2) the Department specifically represented to the court that it was not seeking termination for failure to follow a family service plan under subsection (o), (3) Mother's counsel objected that the service plan in place before the 2012 judgment should not be admitted into evidence because it terminated with that judgment and was thus irrelevant to the current grounds for termination before the court, and (4) the trial court sustained the objection to admission of the pre-2012 service plan on relevance grounds and it was not entered into evidence.

The Department states in its brief that "the evidence conclusively establishes that the mother committed the act of Subsection O of the Family Code before the entry of the prior decree." But the service plan the Department purports to rely upon was excluded from evidence. And, although the Department insists that the "evidence conclusively establishes that the mother" failed to comply with her service plan pre-2012, nothing in the pleadings or trial would have put Mother on notice to put on evidence about whether she complied with the pre-2012 service plan. This issue was not tried by consent, as Mother's counsel successfully excluded the service plan on relevance grounds and the Department *affirmatively represented* to the trial court and Mother that it was *not* seeking termination under the very service plan upon which it now seeks to rely. We thus cannot affirm the trial court's termination of Mother's parental rights for failure to follow a service

22

plan pre-2012, especially when the court refused to admit that service plan because it was not relevant to a pleaded claim.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT TERMINATION OF PARENTAL RIGHTS UNDER § 161.001(b)(1)(E)

Mother first challenges the sufficiency of the evidence supporting termination of her parental rights under § 161.001(b)(1)(E).

**A.     Applicable Law**

The sole ground for termination of Mother's parental rights was section 161.001(b)(1)(e):

> **§ 161.001. Involuntary Termination of Parent-Child Relationship**
>
> . . . .
>
> (b) The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>
>> (1) that the parent has:
>>
>>> . . . .
>>>
>>> (E)     engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>>>
>>> . . . .

TEX. FAM. CODE ANN. § 161(b)(1)(E) (West. 2014).

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Under subsection (E), the relevant inquiry is whether evidence

23

exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; see also TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

## B.     Analysis

Mother concedes that "drug abuse and its effect on the ability to parent can be part of an endangering course of conduct." (citing *J.O.A.*, 283 S.W.3d at 345). She contends, however, that "in this case, the weight to be given to the positive drug test results and, therefore, how mother's drug use many have endangered [KP] remains mainly speculative." She points out that "DFPS failed to call any expert to interpret the results" of her positive drug tests, and that "Youngblood [the caseworker] agreed she was not competent to interpret them." Without such evidence, Mother argues, "the fact finder could not determine the amount of

24

frequency of usage; whether the positive reading could have been caused by mere exposure or for some other reason." In sum, Mother contends:

> [N]o rational trier of fact could have formed a firm conviction that mother's conduct endangered [KP]. The record contains insufficient facts to determine how her four positive drug tests over a three-year period and her failure to complete individual counseling placed [KP] in danger. This is particularly true where the child has not resided with the mother since 2009.

While it is true that it has been a long time since KP has resided with Mother, the cases interpreting section 161.001(1)(b)(E) demonstrate that evidence of a parent's course of conduct, even when the parent is not in possession of their child, can support a finding of endangerment. There is evidence here that Mother has had trouble maintaining a stable living environment for several years. In fact, a case worker testified that Mother had never been able to show her an actual residence. Mother testified that, if she was reunited with KP, they would be living with TR. There was evidence of a course of conduct of positive drug tests by both Mother and TR between the time of the 2012 order and the 2015 termination hearing.

The supreme court has held that "endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage." *J.O.A.*, 283 S.W.3d 336 at 345. Under this reasoning, Mother's repeated use of drugs while she retains custody of KY is evidence of endangerment as it relates to KP, even though KP was in the

Department's custody.[4]  *See id*.; *see also In re S.R*., 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Under subsection E . . . courts may consider conduct both before *and after* the Department removed the child from the home." (emphasis added); *see Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (considering persistent endangering conduct up until time of trial).

Moreover, we have held that "[c]onduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).  Also, although "[m]ental illness alone is not grounds for terminating the parent-child relationship, . . . untreated mental illness can expose a child to endangerment . . . and is a factor the court may consider." *In re S.R.*, 452 S.W.3d at 363.

Mother testified that she has had a job for several months, but did not testify to having a residence.  The record reflects that Mother has a diagnosis of bipolar disorder and depression, but there is no indication that she is being treated, and she refused to continue with the therapist that the Department arranged for her to see.

---

[4]    Although Mother claimed that the results of any positive drug test relating to her or her fiancé TR were false, the trial could have believed that evidence was not credible.  The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

Given the evidence of (1) Mother's course of conduct of drug use while still maintaining custody of KY, (2) Mother's long-term lack of residence or stable living arrangements, (3) Mother's sporadic and inconsistent visitation of KP, (4) Mother's untreated mental illnesses, and (3) Mother's testimony that she and KP would live with TR, who also failed drug tests shortly before trial, the trial court's endangerment finding under section 161.001(1)(b)(E) is supported by legally and factually sufficiency evidence.

We overrule Mother's first issue.

## SUFFICIENCY OF THE EVIDENCE THAT TERMINATION IS IN KP'S BEST INTEREST

In her second issue, Mother challenges the legal and factual sufficiency of the evidence that termination of her parental rights is in KP's best interest.

### A. Applicable Law

There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to

27

assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* The *Holley* factors are not exhaustive. *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). "Moreover, the State need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)).

The Texas Family Code also provides factors that can be used to assess whether a child's parent is willing to provide a safe, stable environment:

**§ 263.307. Factors in Determining Best Interest of Child**

(a) In considering the factors established by this section, the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(b) The following factors should be considered by the court and the department in determining whether the child's parents are willing and able to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department ;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

. . . .

TEX. FAM. CODE ANN. § 263.307 (West Supp. 2015).

## B. Analysis

Mother argues that the *Holley* factors weigh against termination of her parental rights being in KP's best interest. She notes the statement in the CASA's report that KP "has verbalized a desire to return home with his mother and sibling." She points out that the Department does not have an adoptive placement for KP identified, that KP's behavioral problems increased when Mother's visits were stopped, and that she is employed now and that KP could now come live with her, KY, and TR. She acknowledges her repeated failed drug tests, but she argues that evidence should be outweighed by her lack of a criminal record, stable employment, and the fact that KY lives with her and has never been removed. Mother also concedes that given KP's "substantial emotional disorders" and her "own illnesses, it is unlikely she would be able to provide him with adequate care by herself." But she nonetheless argues that because there is no adoptive placement in place for KP, and because KP's behaviors deteriorated when Mother was ordered to stop visiting him, the Department has not established that termination of her parental rights is in his best interest.

The Department disagrees, arguing that the *Holley* factors actually weigh in favor of termination, and it points to the statutory presumption that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE ANN. § 263.307. The Department emphasizes that

Mother has engaged in behaviors that endanger KP's emotional stability over many years and has failed to take corrective actions to protect and be reunited with her child, even with long-term active assistance from the Department.

We agree with the Department that there is legally and factually sufficient evidence that termination of Mother's parental rights is in KP's best interest. While there is evidence favoring Mother when applying the first factor, i.e., desires of the child, the following seven out of eight of the remaining factors weigh in favor of termination being in KP's best interest:

- child's emotional and physical needs now and in the future (KP has been in the custody of the Department for seven years, without Mother ever demonstrating that she can meet his physical or emotional needs);

- child's emotional and physical danger now and in the future (evidence demonstrated that KP needs stability and routine and is violently upset by uncertainty; Mother has no established residency and has shown a pattern of being under the influence of drugs while KP's sibling remained in her care, and she has been inconsistent in her contact with KP, which greatly upsets him);

- the parental abilities of the individuals seeking custody (Mother has demonstrated an inability to remain sober, remain emotionally or mentally healthy, and she is living with a boyfriend that also has a pattern of drug use and a criminal record; in contrast, KP's emotional and physical needs are being meet in his current therapeutic foster home);

- agency's or individual's plans (the Department plans to continue KP in his therapeutic foster home, and then seek a permanent adoptive placement; mother has no plan reflected in the record to obtain a stable residence or environment);

- stability of home or proposed placement (Mother has offered no evidence of a stable home over the last seven years, only testifying that she has a job; the department has KP placed in a loving, stable home where his physical, emotional, and educational needs are being met);

- acts or omissions by parent indicating maintaining parental relationship is not proper (Mother's failure to complete multiple service plans, rejection of the Department's attempts to help her with her own mental illness, continued drug use, and failure to maintain consistent contact with KP or work towards obtaining a stable living arrangement qualify as acts and omissions weighing in favor of termination).[5]

Section 263.307 of the Texas Family Code admonishes that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." KP has languished in the foster care system for seven years, despite the Department's multiple attempts at offering services for Mother to work towards reunification. KP's caseworker and guardian ad litem opined that termination of Mother's parental rights was in KP's best interest because Mother had done so little to regain possession of KP over a period of seven years, had demonstrated an inability to maintain a stable home environment, and had been so

---

[5] To the extent that the last *Holley* factor, i.e., excuses for the acts or omissions of the parent, applies, it falls between neutral and weighing in favor of termination being in KP's best interest. Mother suffers from mental illness. She has, however, offered little in the way of plausible excuses for multiple failed drug tests, and she offered nothing in her testimony to explain why she had been so inconsistent in her visits with KP, why she has never secured stable suitable housing, or why she refused to complete numerous service plans. The excuse she offered for not availing herself of the assistance of the therapist the Department enlisted to help her in parenting and coping with her mental illness was simply that she decided she did not like the therapist.

sporadic in her visitation as to cause him emotional distress. *Depree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ) ("The need for permanence is the paramount consideration for the child's present and future physical and emotional needs."). Further, the goal of a permanent placement through adoption cannot be achieved until Mother's parental rights are terminated. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no. pet.) ("The goal of establishing a stable, permanent home for a child is a compelling government interest."). KP's caseworker testified that she could broadcast KP's information to a larger number of potential adoptive parents if Mother's rights were terminated.

For these reasons, we hold that there is legally and factually sufficient evidence in support of the trial court's finding that termination of Mother's parental rights is in KP's best interest.

We overrule Mother's second issue.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT REMOVAL OF MOTHER AS POSSESSORY CONSERVATOR OF KP

In her third issue, Mother argues that the evidence was insufficient to support her removal as KP's possessory conservator. Specifically, she contends that the Department did not demonstrate that the "circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the early order." TEX. FAM. CODE ANN. §

156.101 (West 2014) (setting forth "Grounds for Modification of Order Establishing Conservatorship or Possession and Access)."

As the Department points out, however, the Texas Family Code expressly states that "an order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides." TEX. FAM. CODE ANN. § 161.206 (West 2014); *In re K.A.S.*, 399 S.W.3d 259, 263 (Tex. App.—San Antonio 2012, no pet.) ("In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.").

In any event, the trial court's finding of "endangerment" in support of termination of Mother's parental rights would serve as "materially and substantially changed" circumstances. TEX. FAM. CODE ANN. § 156.101.

We overrule Mother's third issue.

## CONCLUSION

We affirm the trial court's termination order.


                            Sherry Radack
                            Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.