

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00146-CV

_____

IN THE INTEREST OF M.W., A CHILD

---

On Appeal from the 325th District Court
Tarrant County, Texas
Trial Court No. 325-683388-20

---

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

# MEMORANDUM OPINION

Appellant B.B. (Mother) appeals from the trial court's order terminating her parental rights to her son, M.W. (Mitchell).[1]  She challenges the sufficiency of the evidence to support the child-endangerment grounds for termination.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).  We conclude that the evidence was sufficient to support the fact-finder's determination that Mother engaged in endangering conduct and affirm the termination order on that basis.

## I.  FACTS LEADING TO TERMINATION

On May 7, 2020, Mother was flying to Chicago from California when, during a lay-over in the Dallas–Fort Worth Airport, she went into early labor.  She gave birth to Mitchell at a local hospital and she tested positive for PCP and amphetamines.  Mitchell, who was born weighing three pounds and six ounces, had to be put on a respirator and was placed in the neonatal intensive-care unit.  Mitchell also tested positive for PCP and amphetamines, and Mother admitted that she had used controlled substances—marijuana, methamphetamines, and PCP—while pregnant with Mitchell.  The hospital contacted the Department of Family and Protective Services (the Department) and reported possible "neglectful supervision" of Mitchell.

When the Department's response investigator, Cristian Alfaro, talked to Mother on the night of May 7, Mother stated that she had a long history of drug

---

[1]We use aliases to refer to Mother, the child, and the child's alleged fathers.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

abuse, involving not only cocaine but also marijuana, PCP, and methamphetamines. She told Alfaro that she had used marijuana, methamphetamines, and PCP during her pregnancy to feel better while she had been sick with COVID. She knew she should not have been using such drugs during pregnancy but explained that "addiction is hard to beat." She told Alfaro that she was travelling from California, where she had a house and things were "good," to Chicago to join a "program" that would help her with her addiction. Mother stated that Mitchell was her only child, and she refused to give any information about relatives that could take Mitchell. Mother told Alfaro that Mitchell's father was Mitchell Cane with no further identifying information.[2] Mother informed Alfaro that she had been diagnosed with bipolar disorder. Alfaro confirmed that Mother and Mitchell had tested positive for PCP and amphetamines when Mitchell was born.

The Department's investigator, Roxanne Wigzell, spoke to Mother on May 18. Mother denied knowing why she had tested positive for PCP, speculating that her roommate in California had tried to kill Mother by drugging her. She stated she was going to Chicago to go to drug rehabilitation because she "had been around a lot of addicts recently" and "was starting to get cravings." Mother denied that her drug use had caused her to go into early labor, pointing instead to rough sex she had had with

---

[2]Mother later denied that she had told Alfaro that Cane was Mitchell's father.

Cane the night before she left California. As with Alfaro, Mother would not give Wigzell any information about Cane other than his age—"between 50 and 60."

Wigzell discovered that Mother had other children: "[T]here was a baby who had been removed in California and then - - like in the past year, and that there were two older children who had been adopted in - - somewhere around in Indiana." When Wigzell met with Mother on May 29, Mother admitted that she had other children and that she still had contact with her children who had been adopted in Indiana; however, she would not give Wigzell any information on those two children. Mother stated that she believed all the hospital tests, including her drug tests, were false positives based on something the hospital had given her. She stated that she had been diagnosed with depression but was not taking medication for it, and that she was seeing a psychiatrist. Wigzell described Mother as being evasive when asked questions and as a "scattered and disorganized" thinker. In fact, Mother asked Wigzell if she was working with California in a conspiracy to take Mitchell. When Wigzell asked Mother to take a hair-follicle drug test, she became upset and yelled that she was an addict and did not know what she would test positive for. Wigzell noted that Mother did not have a stable living environment.

On June 8, the Department filed a suit affecting the parent–child relationship (SAPCR), seeking to be named Mitchell's managing conservator and, barring reunification with Mother, the termination of her parental rights. Among other

4

grounds to support the termination request, the Department alleged child-endangerment grounds:

> 1. Mother "knowingly placed or knowingly allowed [Mitchell] to remain in conditions or surroundings which endanger the physical or emotional well-being of [Mitchell]" or
>
> 2. Mother "engaged in conduct or knowingly placed [Mitchell] with persons who engaged in conduct which endangers the physical or emotional well-being of [Mitchell]."

*See id.* In an emergency removal order, the trial court named the Department as Mitchell's temporary sole managing conservator. In a later family service plan, the trial court ordered Mother to complete several services: alcohol and drug assessments, parenting classes, individual counseling, a psychological evaluation, and all requested alcohol and drug screenings. She was further instructed to obtain stable housing.

On June 15, Wigzell asked for more information on the man Mother thought was Mitchell's father. Two hours later, Mother texted Wigzell: "Fired, pick bones, history, bitch, please." A second text said, "[Mother], Fort Worth, children homes." Then several texts from Mother to Wigzell: "Warrant for your arrest, self-served, sexual harassed, original caseworker I spiked . . . to, false identity." Mother then texted that she did not know who or where she was. When Wigzell asked Mother if she needed help, Mother responded, "I was just diagnosed with schizophrenia, lose my number."

Wigzell concluded that there was reason to believe that Mitchell would be neglectfully supervised because Mother had had a positive drug test when she

5

delivered Mitchell, she admitted to using controlled substances while pregnant, and she later tested positive for drug use. Wigzell noted that Mother had not appeared at the trial court's prior contested hearing because she had left Texas for Illinois. Wigzell did not know if Mother ever returned to Texas.

On July 13, Mitchell was released from the hospital and placed with a foster family.

Marion Smith was Mother's first Department case manager. Mother was uncooperative and would not sign or participate in the family service plan. She did, however, visit Mitchell three times.

Tamesha Mondy, Mother's second case manager, was assigned Mother's case in March 2021. However, she was unable to contact Mother until April 22—seven days before trial on the Department's SAPCR. At that time, Mother was in California and said she was going to Houston. Mother would not give Mondy her mailing address in California or Houston. She did tell Mondy that she believed she had completed every service that she needed to complete and did not need to "complete anything additional." During this conversation, Mondy attempted to clear up the identity of Mitchell's father. Mother stated that Cane was "an associate" but not Mitchell's father; Mother asserted instead that Mitchell Robinson, an attorney in California, was

Mitchell's father and that he had died shortly after Mitchell's birth.[3]  Mother then hung up on Mondy.  Five days later, Mother called Mondy asking about "Mitchie," which was a nickname that had never been used to refer to Mitchell.

Mother testified at the April 29 virtual bench trial.  She stated that she lived in California and proffered a lease that she had signed on October 19, 2020.  She further explained that after renting a room in Chicago "to get an idea" in July 2020, she returned to California and signed the lease where she had remained other than "traveling . . . back and forth" to Texas to see Mitchell.  However, the Department pointed out that mail sent to Mother at the address listed on the lease had been returned as undeliverable, which Mother asserted was a result of the address being "considered a vacant building."

Mother claimed that she had repeatedly tried to contact Smith to no avail and that Smith had "stood [Mother] up" on one of her scheduled visitations with Mitchell.  Mother stated that she had tried to complete some of the services in the family service plan—"parenting . . . and therapeutic sessions."  To that end, she attempted to proffer a certificate showing that she had completed a parenting class, but the certificate was dated in 2004.  Accordingly, the trial court excluded the completion certificate.

---

[3]This mystery was never solved because neither man could be located.  The trial court appointed each alleged father an attorney ad litem, and the trial court later terminated each alleged father's parental rights to Mitchell.

Mother contended that her sister could take Mitchell, but Mother did not have her sister's contact information. Mother admitted that she had been arrested in 2018 in California for felony harm to a child causing great bodily injury and explained that her third child's removal in California was part of a "third-world country scam." Mother stated that she has had in-patient drug treatment approximately three times, the most recent of which occurred in April 2020, and out-patient treatment approximately five times. Mother recognized that she received disability payments based on her diagnoses of bipolar disorder and depression but said that she takes no medications for those illnesses.

Mondy testified at trial that the termination of Mother's parental rights would be in Mitchell's best interest:

> [Mitchell] was born premature and he does have ongoing breathing issues, which is of concern. And as far as [e]nsuring that he does get the proper medical treatment that's dealing with doctors and taking the proper medication, that is of high concern due to [Mother's] - - you know, I guess at this point I don't have any information with her actually seeking treatment for herself as far as mental health wise. So just as far as not even knowing or having the proper knowledge that she would even make sure that his needs are being assessed and cared for, that is a concern.
>
> As far as dealing with [Mother] and not having the proper living situation as far as stability and providing some type of housing arrangements for him and then also due to the lack of her not completing services I can't really assess her stability at this point because of the lack of information that I have regarding her.
>
> And then also [e]nsuring that his needs will be taken care of. [Mother] has an extensive drug history as well, which to my knowledge

8

there has not been any type of treatment in regards to that. . . . [Cleaned up.]

The trial court found by clear and convincing evidence that Mother had committed one or more of the enumerated acts or omissions justifying termination, specifically the two child-endangerment grounds. The trial court further found that it was in Mitchell's best interest for Mother's parental rights to be terminated. Accordingly, the trial court terminated Mother's parental rights to Mitchell and appointed the Department as Mitchell's permanent managing conservator.

Mother now appeals the termination and asserts that the evidence was insufficient to support either the endangering-environment or the endangering-conduct ground for termination. She does not attack the trial court's best-interest finding.

## II. ENDANGERMENT GROUNDS FOR TERMINATION

### A. STANDARDS AND SCOPE OF REVIEW

For the trial court to terminate a parent–child relationship, the Department must have proved two elements by clear and convincing evidence: (1) that Mother's actions satisfied one ground listed in Section 161.001(b)(1) and (2) that termination was in Mitchell's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.

9

Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802. Because Mother does not challenge the best-interest finding, we will confine our analysis to the endangerment findings.

To determine whether the evidence is legally sufficient, we look at all the evidence in the light most favorable to the challenged endangerment finding to determine whether a reasonable fact-finder could have formed a firm belief or conviction that the finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the fact-finder settled any evidentiary conflicts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We consider evidence favorable to the finding if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* The fact-finder is the sole judge of the witnesses' credibility. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the fact-finder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a fact-finder could have reasonably formed a firm conviction or belief that the Department proved the alleged endangerment ground. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the fact-finder reasonably could have formed such a firm conviction or belief, then the evidence is factually sufficient. *Id.* at 18–19. With the factual-sufficiency standard so phrased, we note that there is little if any practical

10

difference between the legal- and factual-sufficiency review standard in termination appeals. *See In re J.R.K.*, 104 S.W.3d 341, 344 (Tex. App.—Dallas 2003, no pet.).

Again, our scope of review with either analysis is the entirety of the record evidence. Mother attempts to narrow this scope to only the trial testimony, noting that Smith did not testify. However, the trial court heard Alfaro's, Wigzell's, Mondy's, and Mother's testimony, and we may presume that the trial court sua sponte took judicial notice of its own records, including its orders and incorporated findings. *See A.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00593-CV, 2020 WL 560585, at *3 (Tex. App.—Austin Feb. 5, 2020, pet. denied) (mem. op.); *In re B.D.A.*, 546 S.W.3d 346, 363–64 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (op. on reh'g). Thus, we may consider this evidence in our review.

## B. ENDANGERING CONDUCT

In her second point, Mother argues that the evidence did not legally or factually support a finding that she engaged in endangering conduct. That ground, found in Section 161.001(b)(1)(E), focuses on the danger directly resulting from the parent's conduct, which includes the parent's affirmative acts, omissions, or failures to act. *See In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). It is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *See Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The danger to the child may be inferred from parental misconduct. *Id.* at 533; *K.P.*, 498 S.W.3d at 171. A parent's past endangering conduct can create an inference

that similar conduct could recur and further jeopardize a child's well-being. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). And a parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's well-being. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

The trial court heard evidence that Mother recognized she was a longtime drug addict and admitted to taking controlled substances while pregnant with Mitchell. Indeed, Mitchell tested positive for PCP and amphetamines at birth. Mother could or would not give information about family members who could care for Mitchell or about Mitchell's biological father. She did not have consistent housing, and she admitted that her California lease was in a vacant building. She had repeatedly participated in drug-treatment programs but was unable to stay clean. In fact, her parental rights to her older children had either been surrendered or terminated. Mother had been diagnosed with bipolar disorder and depression but would not take medication for the conditions even though she received disability payments. Neither would Mother participate in the trial court's family service plan. We conclude this evidence was legally and factually sufficient to support the trial court's finding that Mother engaged in endangering conduct, violating Section 161.001(b)(1)(E). *See, e.g.*, *In re L.C.*, No. 12-19-00137-CV, 2019 WL 4727826, at *8 (Tex. App.—Tyler Sept. 27, 2019, no pet.) (mem. op.); *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *7 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.); *In re A.J.R.*, No. 13-

12

08-00607-CV, 2009 WL 2574079, at *7–8 (Tex. App.—Corpus Christi–Edinburg Aug. 20, 2009, no pet.) (mem. op.); *In re Z.D.*, No. 2-07-386-CV, 2008 WL 4354936, at *7 (Tex. App.—Fort Worth Sept. 25, 2008, no pet.) (mem. op.); *W.D. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-14-00581-CV, 2015 WL 513267, at *4 (Tex. App.—Austin Feb. 5, 2015, no pet.) (mem. op.).

Mother counters that the Department's evidence suffered from a "fatal flaw": the Department failed to introduce hospital records of or expert testimony on Mother's and Mitchell's positive drug tests, Mother denied that Mitchell had tested positive for controlled substances at birth, and Mother denied any knowledge of how she could have tested positive. But the evidence before the trial court showed that Mother admitted to Alfaro that she had taken marijuana, methamphetamines, and PCP during her pregnancy and that she had a long history of abusing those substances. Alfaro confirmed with the hospital that Mother's and Mitchell's tests had been positive. Mother's protestations that the tests were either unreliable or wrong and her assertions that other evidence should have been introduced to prove the positive results were credibility determinations for the fact-finder. *See J.P.B.*, 180 S.W.3d at 574.

Mother also asserts that any reference to Mother's use of "PCP" is insufficient because there was no evidence what PCP referred to, that it was a controlled substance, or that it endangered Mitchell. We conclude that the Department did not

13

need to present further evidence defining PCP, which is a common initialism for phencyclidine, or its potential effects on Mitchell. *See A.B.*, 2020 WL 560585, at *4.

## III. CONCLUSION

Because the evidence was sufficient to support the trial court's endangering-conduct ground for termination, we overrule Mother's second point. We need not address her first point, which attacks the trial court's endangering-environment finding, because we have found sufficient evidence of the trial court's other endangerment finding. *See T.L. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00382-CV, 2019 WL 5779913, at *5 (Tex. App.—Austin Nov. 6, 2019, pet. denied) (mem. op.); *In re J.I.G.*, No. 01-18-00023-CV, 2018 WL 3233874, at *9 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.). Accordingly, we affirm the trial court's termination order. *See* Tex. R. App. P. 43.2(a).

/s/ Brian Walker

Brian Walker
Justice

Delivered: August 19, 2021

14