**Opinion issued June 7, 2018**



In The

# Court of Appeals

### For The

## First District of Texas

———————————————

### NO. 01-17-00958-CV

———————————————

## IN THE INTEREST OF J. V. B., J. M. B., S. A. B., C. C. B., AND T. J., CHILDREN

———————————————

### On Appeal from the 314th District Court
### Harris County, Texas
### Trial Court Case No. 2016-06380J

———————————————

### MEMORANDUM OPINION

J.V.J., mother of nine, appeals the trial court's decree terminating her parental rights to five of her children.[1] J.V.J. challenges the trial court's decree on the grounds that the evidence is legally and factually insufficient to support its predicate findings for termination of her parental rights and its finding that

---

[1] J.V.J.'s four older children, who are not subject to this suit, reside with their fathers.

termination of her parental rights is in the children's best interest. *See* TEX. FAM. CODE § 161.001(b).

The evidence is legally and factually sufficient. We affirm.

## Background

In November 2017, the Department of Family and Protective Services filed a petition for termination of J.V.J.'s parental rights to five of her children—three-year-old twins Jane and Janis, two-year-old twins Carol and Sam, and one-year-old Tom[2]—based on endangerment, constructive abandonment, and failure to comply with her family service plan.[3]

### J.V.J. and the Department

The Department's involvement began on January 27, 2016, when it received the first of six referrals in this case. This first referral alleged physical abuse, physical neglect, and neglectful supervision by J.V.J. At that time, J.V.J., who was 27 years old and pregnant with her ninth child, was living with her children and A.B., the alleged father of some of her children, at J.V.J.'s grandmother's apartment.

---

[2]    We use pseudonyms for the children.

[3]    The Department's petition also sought termination of the parental rights of the children's alleged father, A.B., and any unknown father.

2

According to the first referral report,[4] J.V.J. and A.B. physically abused the children "using belts, sticks, and hands all over the body." Further, the report alleged, J.V.J. was smoking marijuana and selling food stamps to buy drugs, and A.B. was using "pills" and selling crack in front of the apartment complex. The report also stated that Jane, who was two years old at the time, had been rushed to the hospital after swallowing cigarette butts and two pennies. With regard to J.V.J.'s older children (who are not subject to the termination order in this case), the report stated that J.V.J. and A.B. made them "fight each other until one of them bleeds."

After receiving the referral, the Department conducted an investigation and interviewed both J.V.J. and A.B. J.V.J. stated that she had been staying with her grandmother for two or three months. She admitted that she smoked one marijuana blunt each day, but she said she did not do so in front of the children. A.B. denied drug use, but stated that J.V.J. and others living in the apartment smoked marijuana. J.V.J, A.B., and other family members were ordered to undergo drug testing, and they each tested positive.

The following month, the Department made several attempts to reach J.V.J., but the Department was unable to locate her. Then, on February 24, 2016, the

---

[4] Although the removal affidavit was never admitted into evidence and does not appear in the record on appeal, portions of it appear in the caseworker's permanency reports as well as in J.V.J.'s psychological evaluation.

Department received a second referral alleging neglectful supervision and physical neglect of four of the children subject to this termination order. This referral report stated once again that J.V.J. and A.B. smoke marijuana. It added that the conditions in the home were "unlivable": there were 12 people living in a 2-bedroom apartment, with trash and clothes everywhere, dirty dishes in the sink, roaches, and the children sleeping on the floor.

The Department was unable to make contact with J.V.J. again until April 2016, when it received a third referral. That referral alleged that J.V.J. had been evicted from her apartment and left her children at the apartment of Lilian Parker, who was not a relative. According to the report, J.V.J. provided Parker, who had agreed to keep the children for a short period of time, with clothes for only one week. Parker did not have money to care for the children, so as time went by, she tried to reach J.V.J. to ask her to pick them up. But J.V.J. did not answer. When Parker was finally able to reach J.V.J., J.V.J. told her to "put lunchmeat out for the kids and tell them not to open the door." The report also indicated that J.V.J. had been told about places that would help care for the children, but she refused to take advantage of these services, saying she needed the children for benefits.

In its investigation of the April referral, the Department saw the children, but not J.V.J. According to the Department, it appeared that J.V.J. and A.B. "were trying to avoid the Department." The Department again lost contact with J.V.J. and

4

A.B. Then on August 5, 2016, Jane was admitted to the hospital after reportedly having vomited for two days. She had what appeared to be two coins and a screw in her stomach, and as a result, she had to be fitted with a colostomy bag. The Department contacted J.V.J. to tell her that Jane was in the hospital.

Two days into Jane's hospitalization, the Department received a fourth referral, alleging medical neglect and neglectful supervision of Jane by J.V.J. and A.B. The Department interviewed J.V.J., who stated at first that Jane had been with an aunt for the past few months, but then stated that Jane had been with the aunt only "a few days," and that no one had seen Jane swallow the items. The other children subject to this suit were said to be with A.B. in Louisiana.

The referral report noted that while Jane was in the hospital, J.V.J. and A.B. were inattentive to her. It also noted that Jane "has had gastrointestinal issues since 2014" that require special care on a regular basis, and that "[J.V.J.] and [A.B.] have a history of non-compliance with treatment." According to the referral report, J.V.J. stated that the family had been "moving back and for[th] to Port Arthur and could not follow up."

At this point, the Department lost contact with the family again. It received a fifth referral on October 31, 2016, which alleged neglectful supervision of Sam (and three older children not subject to this suit). According to the report, the children had been staying with caregivers, who after four months of caring for

5

them, could no longer afford to do so. The report states that prior to the caregivers' involvement, the children were eating out of a trash can, and that "[t]he person the children were staying with was mistreating them."

Two weeks later, on November 14, 2016, the Department received a sixth referral, stating that Jane had been taken to the emergency room for severe stomach problems and a rash on her buttocks. According to the referral report, J.V.J. had failed to take Jane to her follow-up appointments after her surgery in August. Jane's aunt, with whom Jane had been staying for several days, informed the medical staff that, according to J.V.J., Jane had had the rash for over a week. Jane's treating physicians also noted "a yellow vaginal discharge," and "excoriations and vesicles on the child's buttocks."

Unable to reach J.V.J. to obtain her consent for Jane's treatment, the Department took possession of the five children subject to this suit. On November 21, 2016, the Department filed a petition for protection and conservatorship and for termination of J.V.J.'s and A.B.'s parental rights.

Removal

In its removal affidavit, the Department stated that J.V.J. is "either unwilling or unable to properly care for the children." The Department also stated that "the family has been avoiding the agency and provided a false address," and that J.V.J. has placed the children with various caregivers "to avoid CPS (Child Protective

6

Services)." Further, the Department noted that J.V.J. has a history of illegal drug use, and she leaves her children with individuals she does not know personally, and who are unable to consent for medical treatment.

Following a December 1, 2016 adversary hearing, the trial court signed an order appointing the Department as temporary managing conservator of the children. Several weeks later, the court entered an order that J.V.J. was to follow a family service plan developed by the Department. The plan noted some of the Department's initial concerns, which included J.V.J.'s substance abuse, her history with the Department, and her lack of stable housing.[5]

The plan also set forth several tasks and services for J.V.J. to complete before she would be reunited with her children, including attending all court hearings and scheduled family visitations, maintaining stable housing and income, submitting to random drug testing, following the recommendations of her substance abuse and psychological assessments, and completing parenting classes.

J.V.J. participated in a psychological evaluation. According to the evaluation report, J.V.J. stated that she had been investigated by CPS before. Her first

---

[5] J.V.J.'s history with Child Protective Services is noted in the Department's Permanency Report and includes a 2009 referral for neglectful supervision and physical abuse that was ruled "unable to determine," as well as a 2015 referral for physical abuse that was "ruled out." Additionally, J.V.J. reported a prior CPS investigation for marijuana use: "They had found it in my system when I had my second baby I think. I can't remember if it was my first or second baby but I do know I had it in my system. I had to take parenting classes and they closed it."

investigation took place after marijuana had been detected in her system when she gave birth to one of her children. She asserted that the current case was initiated after her uncle "pulled a gun on [her] and [she] called the police," after which her uncle "retaliated" by reporting her to CPS.

Regarding drug use, J.V.J. reported that she began using marijuana at the age of 18 and had used it every day until the age of 26, when she stopped "because of [her] CPS case." The evaluator noted that J.V.J. was unable to correctly spell two of her nine children's names.

J.V.J. also recounted having been in "multiple abusive relationships."

With regard to employment, the evaluator's report states that although J.V.J. indicated that she had been working for two weeks as a home health care provider, she did not know the name of the company that employed her. She reported that this was her first job.

The evaluation report also observes that

> [J.V.J.'s] approach to the evaluation was very nonchalant. She did not appear overly concerned about the welfare of the children; however, she did verbalize a desire for her children to be returned to her care. At the present time, it is unclear if she verbalize [sic] statement is an actual desire to fully parent her children or more so of the need for closure of her CPS case so that she can move forward without any tools to prevent further CPS involvement.

In a Permanency Report filed with the trial court on June 6, 2017, Keverlyn Walker, the Department caseworker, notes that

[T]he family has been avoiding the agency and provided a false address for the location of the children in Louisiana. According to friends of the family [J.V.J.] and [A.B.] have placed the children with various caregivers around Houston in order to avoid CPS. [J.V.J.] has history with the agency involving drugs and has gone through Family Based [S]afety Services (FBSS) in the past. The family has not been truthful about the extent of their drug use at this time. [J.V.J.] is leaving her children with individuals who have no ability to consent for medical treatment and who she does [not] know personally put her children at risk.

On September 15, 2017, the caseworker filed another Permanency Report, this time recommending termination of J.V.J.'s parental rights. The report states that J.V.J. failed to complete individual counseling, parenting classes, anger management classes, and substance abuse treatment, and she did not demonstrate stable housing or employment. She also did not show she could maintain sobriety. Further, J.V.J. missed two court hearings, failed to report for some of her requested drug screens, and, when she did report, often tested positive for drugs.

The case proceeded to a bench trial on November 2, 2017. The caseworker testified on numerous topics, beginning with the Department's investigation of the six referrals. She testified that J.V.J. had an extensive CPS history, and that J.V.J. had left the children for extended periods of time "with complete strangers" without providing for them.

Regarding participation in the family service plan, the caseworker testified that J.V.J. had completed the basic assessments—but not individual counseling, parenting classes, anger management classes, or substance abuse treatment. The

9

caseworker stated that she had "even beg[ged] the service providers to not discharge [J.V.J.]," but J.V.J. relapsed and "just hadn't been able to like get back on track."

The caseworker also testified that J.V.J. did not always participate in drug testing when it was requested of her, and that she tested positive for marijuana in December 2016, and January, July and October 2017, and for cocaine in June and August 2016, and January, July, September, and October 2017.[6]

Nor had J.V.J. maintained stable housing since the case was initiated. Specifically, the caseworker testified that J.V.J. had reported "at the last court hearing," that she was living with her grandmother, but the caseworker had been unable to verify this. The caseworker believed J.V.J. had been living in a motel before that, and she estimated that J.V.J. had been unable to remain in one place for longer than two and a half months at a time.

---

[6]  J.V.J.'s drug testing records show that she also tested positive for marijuana and cocaine in August 2017, and that results were negative for all substances tested on March 3, March 31, April 25, July 14, September 11, and October 5, 2017. J.V.J.'s records also show that she did not appear for testing on January 12, 2017 or March 30, 2017. Her failure to appear for testing may be treated as positive for illegal drugs. *See In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (refusal to provide samples for drug testing permitted court to infer that father refused testing because it would be positive); *see also In re I.W.*, 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.).

In terms of employment, the caseworker estimated that the longest J.V.J. had been employed during the pendency of the case was approximately two to three months. At the time of trial, J.V.J. reported that she was working for her grandmother, but the caseworker was unable to confirm this.

The caseworker further testified that J.V.J.'s visitation had been halted "[u]ntil she further engages in services," and from that point forward, J.V.B. failed to maintain any form of contact with the children. She did not send them cards, letters, birthday presents, or any kind of support. Only once while the case was pending did she ever ask how they were doing.

At the time of trial, the children were living in foster homes, with the eldest set of twins together in one placement, and the youngest three children together in a second placement. The two foster homes were close to one another, and the foster families maintained contact between the five siblings. The caseworker stated that she had visited both foster homes, and she believed that the foster families were meeting the children's basic and special needs, including those associated with Jane's medical issues and Sam's speech delay. The children appeared to be bonded with their foster parents, who were present at trial and wished to adopt the children.

In sum, the caseworker testified that the Department was requesting termination of J.V.J.'s parental rights because J.V.J. had placed her children in

emotional or physical danger, and she did not believe J.V.J. was capable of providing the children with a safe environment.

J.V.J. also testified. Regarding her failure to comply with the family service plan, she stated that she had trouble communicating with the caseworker, who she said had not given her the information she needed to comply with the plan until it was too late. J.V.J. also testified that she had difficulty finding transportation to her counseling appointments. She did, however, take responsibility for her failure to engage in substance abuse treatment, stating that "[w]hen I was going to it, I'm in my wrong, I wasn't doing what I'm supposed to do at the time."

J.V.J. stated that she was willing "to do everything I have to do to get my kids." She also stated that she had just begun to participate in her substance abuse treatment, and asked that the trial court to give her "a little bit more time," and place the children with her cousin until she could "get situated."

J.V.J.'s cousin, Tierra Miller, testified that she would like the court to place the five children in her care because "it would be best for them to be with family." Miller had four children already, but she said that she had a stable home, and that she had been a "substantial" part of the children's lives prior to the Department's involvement. She testified that she tried several times to get in contact with J.V.J. to "obtain custody of them." She stated that she was willing to take the children immediately. Miller asserted that she had a full-time job in which she earned

12

"enough for nine children." She also made efforts to obtain a license to become a foster mother.

After the trial, the court signed a decree terminating J.V.J.'s parental rights.[7]

**Discussion**

Although J.V.J. concedes that the evidence was legally and factually sufficient to support one of the trial court's predicate findings, she asserts that the evidence was legally and factually insufficient to support the trial court's predicate findings regarding endangerment and constructive abandonment. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E) (endangerment), (N) (constructive abandonment). She also challenges the trial court's determination that termination of her parental rights was in the children's best interest. *See id.* § 161.001(b)(2).

**A.    Standard of Review**

To terminate parental rights under section 161.001, the Department must establish by clear and convincing evidence that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the child's best interest. *Id.* § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as

---

[7]    The decree also terminated the parental rights of alleged father A.B. and any unknown father.

13

to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *see also In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

Importantly here, "[o]nly one predicate finding under section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ("A single predicate finding under section 161.001(1) of the Family Code is sufficient to support a judgment of termination when there is also a finding that termination is in the child's best interest."). "Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights." *T.G.R.-M.*, 404 S.W.3d at 13 (citations omitted).

In conducting our legal-sufficiency review, we look at the entire record to determine whether the evidence, viewed in the light most favorable to a finding, is such that a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See J.O.A.*, 283 S.W.3d at 344–45 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* at 344 (quoting *J.F.C.*, 96 S.W.3d at 266).

In conducting a factual-sufficiency review, we review all evidence, including disputed or conflicting evidence. *Id.* at 345. The evidence is factually insufficient only if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" regarding the finding under review. *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

## B. Challenge to Predicate Findings for Termination

The trial court terminated J.V.J.'s parental rights based on predicate findings under subsections (D), (E), (N), and (O) of section 161.001(b)(1) of the Family Code. J.V.J. does not challenge the trial court's subsection (O) predicate finding. Nor does she contend that more than one predicate finding is required to support the trial court's decree of termination in conjunction with its best-interest finding.[8] *See A.V.*, 113 S.W.3d at 362 ("Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

Nevertheless, she asks us to review the evidence supporting the trial court's other predicate findings because unchallenged predicate findings can be used to

---

[8] The trial court's subsection (O) predicate finding was that J.V.J. failed to comply with the family service plan.

support a best-interest finding and because subsection (D) and (E) predicate findings can have collateral consequences in subsequent termination proceedings involving other children. *See* TEX. FAM. CODE § 161.001(b)(1)(M) (allowing termination where parent has had parental rights terminated with respect to another child based on findings under subsections (D) or (E)).

Accordingly, although J.V.J. concedes the trial court's subsection (O) predicate finding, because its subsections (D) and (E) predicate findings could affect J.V.J. in future termination proceedings, we begin by evaluating the sufficiency of the evidence supporting those findings. In addition, we consider the evidence supporting the trial court's subsection (D), (E), and (N)[9] predicate findings in conducting our review of the trial court's best-interest determination. *See C.H.*, 89 S.W.3d at 28 (evidence that establishes a predicate finding under section 161.001(b)(1) may be probative of the best-interest issue).

### 1.    Applicable Law

Subsections (D) and (E) of Family Code section 161.001(b)(1) both concern child endangerment, which means "to expose to loss or injury, to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d at 533; *In re K.P.*, 498 S.W.3d 157,

---

[9]    The Department concedes that the evidence is insufficient to establish that J.V.J. failed to maintain significant contact with the children, one of the requirements to support a constructive abandonment predicate finding under subsection (N). *See* TEX. FAM. CODE § 161.001(b)(1)(N)(ii).

171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). They differ with regard to the source and proof of endangerment. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Subsection (D) focuses on the child's living environment and requires evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings [that] endanger the physical or emotional wellbeing of the child." TEX. FAM. CODE § 161.001(b)(1)(D); *A.S.*, 261 S.W.3d at 83.

In contrast, under subsection (E), the danger must be the direct result of the parent's conduct. TEX. FAM. CODE § 161.001(b)(1)(E); *A.S.*, 261 S.W.3d at 83;. The inquiry under subsection (E) is whether evidence shows that the child's endangerment was the direct result of the parent's conduct—including "acts, omissions, or failures to act." *K.P.*, 498 S.W.3d at 171; *see also* TEX. FAM. CODE § 161.001(b)(1)(E).

Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *K.P.*, 498 S.W.3d at 171; *see also* TEX. FAM. CODE § 161.001(b)(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *K.P.*, 498 S.W.3d at 171. The danger to the child's well-being may be inferred

17

from parental misconduct. *Boyd*, 727 S.W.2d at 533; *K.P.*, 498 S.W.3d at 171. And a parent's past endangering conduct may create an inference that such conduct could recur and further jeopardize a child's present or future well-being. *See In re M.R.J.M.*, 280 S.W. 3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re C.R.*, No. 01-17-00725-CV, 2018 WL 1161810, at *4 (Tex. App.—Houston [1st Dist.] Mar. 6, 2018, no pet. h.) (mem. op.).

2. **Discussion**

We begin with J.V.J.'s assertion that the evidence was legally and factually insufficient to support a finding that she endangered her children's physical or mental well-being under Family Code section 161.001(b)(1)(E). It was not.

For one, the record reflects that J.V.J. neglected Jane's medical needs. J.V.J. failed to take Jane to post-surgery follow-up doctor visits, which resulted in Jane's further hospitalization. J.V.J. was also inattentive to Jane while Jane was in the hospital, had a history of non-compliance with treatments, left her children with people who were unable to consent to medical care, and was unreachable to consent to Jane's treatment. *See Wyatt v. Dep't of Family & Protective Servs.*, 193 S.W.3d 61, 68 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (mother's pattern of medical neglect supported physical and emotional well-being finding).

Evidence also supports a finding that J.V.J. failed to provide for her children's basic needs, thus endangering their well-being. J.V.J. left the children

18

with unrelated caregivers who reported that she did not provide them with enough clothes or money to cover the children's needs. One referral reported that the children were eating out of a trash can, and another described the conditions where at least some of the children resided as "unlivable." *See In re J.S.-A.*, No. 01-17-00491-CV, 2018 WL 891236, at *11 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, no pet. h.) (mem. op.) (mother's failure to provide food, clothing, and money to caregiver supported finding of conscious course of conduct which endangered children's physical and emotional well-being).

The record also reflects J.V.J.'s lengthy and pervasive history of illegal drug (including cocaine) use, which supports a finding of endangerment. *See J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re B.J.*, 01-15-00886-CV, 2016 WL 1389054, at *7 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.) ("[I]llegal narcotics use and its effect on an individual's ability to parent may constitute an endangering course of conduct."); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under section 161.001(b)(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned."). J.V.J. used illegal drugs while she was pregnant with at least two of her children (the older of which is not subject to

19

this suit). *See Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("A mother's use of narcotics during pregnancy may constitute conduct that endangers the physical and emotional well-being of a child."). In fact, the evidence demonstrated J.V.J.'s persistent drug use throughout the Department's investigation. Drug activity can constitute endangerment even if it happens outside the child's presence. *See J.O.A.*, 283 S.W.3d at 346; *Boyd*, 727 S.W.2d at 533; *see also In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("[B]ecause they significantly harm the parenting relationship, criminal offenses and drug activity can constitute endangerment even if the criminal conduct transpires outside the child's presence.").

Notably, J.V.J.'s continued illegal drug use was in direct contravention of her family service plan, which required her to refrain from using illegal drugs. *See In re M.T.W.*, 01-11-00162-CV, 2011 WL 6938542, at *13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children."); *see also In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Continued illegal drug use after a child's removal

20

is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct.").

J.V.J. agrees that the evidence of her drug use is relevant to determining whether she engaged in endangering conduct. But she contends that the evidence is nonetheless insufficient. In so arguing, J.V.J. asserts that the drug testing results admitted into evidence were inadequate to prove her drug use, because expert testimony might have revealed, for example, that some of her positive marijuana results were indicative of exposure as opposed to ingestion. But she provides no authority for the proposition that expert testimony is necessary for a factfinder to conclude that numerous positive drug tests reflect illegal drug use. *See In re M.R.D.W.*, 14-17-00506-CV, 2017 WL 6045575, at *6 (Tex. App.—Houston [14th Dist.] Dec. 7, 2017, no pet.) (mem. op.) ("[T]he Department had no burden to provide expert testimony about Father's test results."); *In re C.M.-L.G.*, No. 14-16-00921-CV, 2017 WL 1719133, at *10 (Tex. App.—Houston [14th Dist.] May 2, 2017, pet. denied) (mem. op.) ("Mother cites no authority, and we know of none, requiring expert testimony about drug test results in parental termination cases."). Moreover, J.V.J. admitted to the caseworker that she smoked marijuana every day. Thus, the evidence of J.V.J.'s continued illegal drug use, including while she was pregnant, supports the trial court's conclusion that she engaged in conduct that endangered the physical and emotional well-being of the children.

21

Considering the evidence in the light most favorable to the trial court's finding under section 161.001(1)(b)(E), we conclude that a reasonable trier of fact could have formed a firm belief or conviction that J.V.J.'s conduct endangered her children's physical or mental well-being. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of a finding of endangerment under section 161.001(1)(b)(E) or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction regarding endangerment. Accordingly, we hold that legally and factually-sufficient evidence supports the trial court's finding under section 161.001(b)(1)(E).

Because termination based on either a subsection (D) or (E) predicate finding is sufficient to invoke paragraph (M) in a future proceeding, and we have found sufficient evidence of the trial court's finding under (E), we need not separately address the sufficiency of evidence supporting the trial court's finding under paragraph (D). *See In re D.S.J.*, No. 01-17-00678-CV, 2018 WL 1003635, at *7 (Tex. App.—Houston [1st Dist.] Feb. 22, 2018, no pet. h.) (mem. op.). We overrule J.V.J.'s first issue.

## C.     The Children's Best Interest

J.V.J. next argues that the evidence is insufficient to establish that termination of her parental rights was in the children's best interest. We disagree.

22

There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). In assessing whether termination is in a child's best interest, courts are guided by the non-exclusive list of factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The factors include: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger of the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.*; *K.P.*, 498 S.W.3d at 173.

The Department "need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *K.P.*, 498 S.W.3d at 173. (quoting *C.H.*, 89 S.W.3d at 27). But the burden is on the Department to rebut the presumption that the best interest of the child is served by keeping custody in the natural parents. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

23

A consideration of the *Holley* factors supports the trial court's determination that termination of J.V.J.'s parental rights was in the children's best interest.

We begin with the third *Holley* factor, which addresses the emotional and physical danger of the child now and in the future. This factor supports the trial court's best-interest determination. Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied). Thus, the evidence discussed in support of the trial court's finding under section 161.001(b)(1)(E) is probative of a finding as to potential danger in determining the children's best interest. *See Walker*, 312 S.W.3d at 619 ("The evidence regarding endangerment, discussed in support of the trial court's finding under section 161.001(1)(E) above, is also probative of a finding as to danger in determining the child's best interest.); *see also C.R.*, 2018 WL 1161810, at *7.

Specifically, evidence of J.V.J.'s neglect, abuse, and use of illicit drugs supports the trial court's best-interest finding. *See J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.) ("A parent's history of drug use or criminal conduct can show a pattern of conduct that subjects a child to an uncertain and unstable life, endangering the

child's physical and emotional well-being."); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child."); *A.M.*, 385 S.W.3d at 82–83 (evidence of mother's history of neglecting and endangering children by exposing them to domestic violence supported trial court's finding that termination was in children's best interest). The trial court's best-interest determination is further supported by the fact that J.V.J. continued to test positive for illegal drugs in direct contravention of her court-ordered family service plan. *In re M.L.G.J.*, 14-14-00800-CV, 2015 WL 1402652, at *7 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.) ("Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct and that termination is in the best interest of the child.").

The fifth *Holley* factor—programs available to promote the children's best interest—also supports the trial court's determination that termination was in the children's best interest. The caseworker testified at trial that the children's foster parents were addressing the children's special needs—specifically, Jane's medical issues and Sam's speech delay—including through programs offered by the Department. In contrast, the evidence established that despite the Department's efforts to assist her in providing a safe environment for the children, J.V.J. moved

the children from home to home and caregiver to caregiver, and she provided false addresses to the Department, making it difficult for the Department to locate her or provide services. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see also* TEX. FAM. CODE § 263.307(b)(10) (considering willingness to cooperate with and facilitate Department's close supervision).

After the children were removed from her care, J.V.J. completed her psychological evaluation and participated in some (but not all) random drug testing. But she did not complete required parenting classes, anger management classes, individual therapy, or substance abuse treatment. This too supports the trial court's best-interest finding. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (holding that finding that parent failed to complete court-ordered services can support best-interest finding); *In re J.M.T.*, 519 S.W.3d 258, 269–70 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("[E]vidence showing that [the parent] failed to complete all of the tasks and services required in his service plan supports the trial court's best-interest finding.").

The seventh *Holley* factor—which considers the plans for the children and the stability of the home—is in accord. The evidence showed that J.V.J. did not provide the children with a safe and stable environment. *See C.H.*, 89 S.W.3d at 28 (weighing evidence that parent had criminal history involving drugs, history of remaining apart from children, and no concrete plans to provide support in favor of

finding that termination was in children's best interest). Moreover, her psychological evaluation noted that she "did not seem overly concerned about the welfare of her children."

At the time of trial, J.V.J. reported she was again living with her grandmother—and evidence in the record suggests that the conditions in which they previously lived were "unlivable." The caseworker estimated that J.V.J. had not recently stayed in one place for longer than two and a half months. And J.V.J. asked that the trial court place the children temporarily with her cousin, even though that cousin was already caring for four children.

On the other hand, the record reflects that the children are doing well in their placements and have bonded with their foster families, who plan to adopt them. The evidence also shows that the children have been well cared for in their foster homes. Further, the foster families live near each other and keep the children in contact. *See J.M.T.*, 519 S.W.3d at 270 (placement in safe, stable foster home where child was doing well supported trial court's best-interest finding); *Rogers v. Dep't of Family & Protective Servs.*, 175 S.W.3d 370, 378 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd w.o.j.) (successful foster placement and possibility of adoption by foster parents supported determination that termination of parental rights was in children's best interest).

Finally, the eighth *Holley* factor considers any acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one. Although J.V.J. completed several of the tasks and services in her family service plan, she did not follow through with the required steps for reunification with the children (including ending her drug use). The trial court was permitted to find that this, too, weighed in favor of its best-interest determination. *See J.M.T.*, 519 S.W.3d at 270 ("A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that he does not have the ability to motivate himself to seek out available resources needed now or in the future."); *D.S.J.*, 2018 WL 1003635, at *9 ("The trial court could infer from a parent['s] failure to utilize the available programs that the parents did not have the ability to motivate themselves in the future.").

After reviewing all of the evidence in the light most favorable to the trial court's best-interest finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of J.V.J.'s parental rights was in the children's best interest. We further conclude, viewed in light of the entire record, that any disputed evidence that a reasonable factfinder could not have resolved in favor of the best-interest finding was not so significant that the factfinder could not reasonably have formed a firm belief or conviction. Thus, we

hold the evidence was legally and factually sufficient to support termination of J.V.J.'s parental rights to Jane, Janis, Carol, Sam, and Tom.

## Conclusion

We affirm the judgment of the trial court.


Jennifer Caughey
Justice

Panel consists of Justices Bland, Lloyd, and Caughey.