**Opinion issued June 11, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-25-01074-CV

———————————

## IN THE INTEREST OF A.A., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-02614J**

---

## MEMORANDUM OPINION

After a bench trial, the trial court signed an order terminating Mother's parental rights to A.A. On appeal, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings of statutory grounds for termination and the trial court's best-interest finding. *See* TEX. FAM.

CODE §§ 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (b)(2) (best interest of child).

We hold that the evidence was sufficient to support the trial court's statutory grounds for termination and legally sufficient to support the trial court's best-interest finding. We hold that the evidence was factually insufficient to support the finding that termination of Mother's parental rights was in A.A.'s best interest. We reverse and remand.

## Background

### A. Removal

In October 2024, law enforcement responded to a call at the home Mother shared with her boyfriend, Christopher Herman, and four-month-old A.A. After an argument, Mother had attempted to prevent Herman from leaving and tried to cut his throat with a bus card. Herman hit Mother in the face, breaking her nose. Mother was transported to the hospital.

Once she arrived at the hospital, Mother was referred for an inpatient psychiatric stay, and she did not have anyone to care for A.A. The Texas Department of Family and Protective Services (the "Department") received a referral regarding neglectful supervision of A.A. Finding that there was an immediate danger to the physical health or safety of A.A., the trial court signed an emergency temporary order appointing the Department temporary sole managing

2

conservator of A.A., who was placed with foster caregivers. The court appointed an attorney to represent Mother.

## B.    The Service Plan

After an adversarial hearing, the trial court entered an order requiring Mother "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." The order notified Mother that failure to comply with the court's orders "may result in the restriction or termination of parental rights."

The November 2025 service plan indicated that the Department's goal was family reunification, with an alternative goal of family/fictive kin adoption. The plan states that the Department was concerned that Mother's alcohol addiction was impairing her ability to provide a stable environment for A.A. The Department was also concerned about domestic violence in Mother's household and Mother's limited support network. The goal of the plan was for Mother to demonstrate the ability to provide a safe, stable, and nurturing environment for A.A. through addressing her alcohol addiction, eliminating the presence of domestic violence, and expanding her circle of support.

Mother's service plan required that Mother obtain and maintain stable employment and provide recent paystubs as verification; secure and maintain stable housing and provide proof; attend parenting classes, participate in

Alcoholics Anonymous meetings and obtain a sponsor, attend domestic violence classes, complete a psychosocial assessment and follow treatment recommendations, attend individual counseling sessions, and identify and establish relationships with supportive individuals outside her household. The plan required Mother to provide proof she fulfilled each of these objectives.

After two permanency hearings, the case proceeded to trial in October 2025.

## C.      Hearing on Motion to Extend the Dismissal Date

At trial, before evidence was presented, the court held a hearing on the Department's motions for continuance and to extend the dismissal date to allow more time to place A.A. in a relative placement and for A.A.'s biological Father to work services.[1] The Department's caseworker testified that one-year-old A.A.'s foster home was meeting all her needs and that the Department's goal was unrelated adoption with the current foster parents with a concurrent goal of relative adoption.

The caseworker told the court that Mother had completed all services listed in the Department's service plan. Mother had verifiable, stable employment and had provided pay stubs for a job she had held for three months. The Department verified with Mother's landlord that she had a three-month lease, but the

---

[1]     Father completed DNA testing two weeks before trial, and he was presented with the family service plan to sign on the day of trial. After trial, the trial court granted Father possessory conservatorship. He is not a party to this appeal. Testimony regarding Father is omitted unless it relates to Mother.

4

Department did not consider a three-month lease to be stable housing. The caseworker testified that Mother was taking her necessary medications, testing negative in random drug testing, and participating in all but one of her unsupervised visits with A.A., and the missed visit was due to confusion.

Despite Mother's progress, the caseworker asked the court to find Mother noncompliant with her services based on lack of stable housing, lack of an Alcoholics Anonymous sponsor, and only three months of job history.

On cross-examination, Mother's attorney questioned why the Department's permanency report, filed a few weeks before trial, listed the Department's goal as family reunification, and the caseworker said that the report was incorrect. The caseworker agreed that Mother was partially compliant because she had completed her services, but she said that Mother lacked both an Alcoholics Anonymous sponsor and stable housing because her roommate had a criminal history of possession of illegal substances. The caseworker said that the Department would consider allowing Mother to have more time to secure housing without a roommate. The caseworker also said that Mother was newly "back on track" taking her prescribed medication, but she thought Mother's progress was only motivated by her concern about trial and noted that Mother's rights to five other children were previously terminated.

The caseworker and the Child Advocates volunteer both agreed that A.A. was thriving in her current placement, bonded to her foster parents, and making progress on her milestones with therapy and practice with her foster parents. The caseworker noted that sometimes A.A. was more anxious after visits with Mother, mentioning one visit, in which Mother gave A.A. oat milk which led to her vomiting. The caseworker said that A.A. was delayed in walking and talking, but her foster parents were addressing it.

At the conclusion of testimony, the trial court held that there were no extraordinary circumstances to justify delay, and that trial would occur later in the day.

**D.    Trial testimony**

**1.    Department Caseworker**

The caseworker's testimony was largely consistent with the previous hearing testimony, relating the fight between Mother and her boyfriend that resulted in Mother's referral to a psychiatric inpatient program without any emergency care for A.A.

After Mother was released from the hospital, the Department created a service plan for Mother including the requirements that Mother find stable housing, attend parenting classes, attend Alcoholics Anonymous meetings and obtain a sponsor, attend substance abuse classes, attend domestic violence classes,

6

participate in psychosocial, psychiatric, and psychological evaluations and individual therapy, and develop a social support system. The caseworker testified that Mother completed most of the services. According to the caseworker, the Department remained concerned about Mother's housing and employment, her lack of an Alcoholics Anonymous sponsor, and her ongoing medication management. The caseworker testified that Mother initially worked services, stopped around August, and resumed when the case was set for trial.

The caseworker was concerned about Mother's ability to protect A.A. because Mother returned to living with the boyfriend who assaulted her. As of the second permanency hearing, they had broken up, and Mother was "put out" of their "home."

The caseworker said that A.A. was one year old with developmental delays and that she received therapies with her current placement, and she did not know if Mother could manage A.A.'s delays and treatment. The caseworker testified that Mother was given less restrictive visitation, but that it was "pull[ed] back," and the Department did not think she was capable of expanded visitation.

The caseworker said the foster parents would like to adopt A.A. She stated that termination was in A.A.'s best interest due to Mother's "failure to stay compliant with the services such as stable housing, stable employment, medication compliance, [and] meeting with a sponsor."

7

The caseworker said that visitation was reduced from every week to every other week because the foster parents, who want to adopt A.A., reported observing signs of anxiety after visits. She testified that Mother had more than ten unsupervised visits with the child, and the only issue was that Mother fed A.A. oat milk one time, but Mother was receptive to guidance not to do so in the future. She stated that Mother and A.A. are bonded.

The caseworker said that she thought it was in the best interest to terminate parental rights even though Mother had a good relationship with A.A. because Mother was not in compliance with taking her medication, and she had only recently been employed for three consecutive months and had had four different jobs during the year-long case. Mother also had a history of bipolar disorder and had not been consistently taking medication. In July when the caseworker visited Mother, the medication bottles Mother provided were dated June 3 and full. When asked for a new bottle, Mother did not provide it. The caseworker called Mother's pharmacy who informed her that Mother had not refilled the medication since June. The caseworker concluded that even if Mother obtained medication in June, she had not been taking it. She testified that Mother did not take her psychiatric medication between July and September 2025. Mother had obtained new

medication in early October 2025 and showed recent compliance.[2] The caseworker stated that Mother needs to show that she is able to provide a safe and stable environment by having stable housing and keeping a job for an extended period of time and noted, again, that Mother had five prior terminations on endangerment grounds.

### 2.     Mother

Mother admitted that she has six children, and that her rights to five of them have been terminated because she was using drugs and did not do any of the Department's services to maintain the parent-child relationship. Those children live with her mother in Harlingen, and she maintains a relationship with them.

Mother agreed that A.A.'s case began after domestic violence with a boyfriend. Although she did go back to live with him after the case started while he was also voluntarily completing services for the Department, the relationship had ended. There were no other instances of domestic violence. They attended couples counseling together, and they later decided to break up because they could not get along. Mother went to live with a friend and then obtained her current apartment. She testified that she had lived in her current apartment since late August 2025 and that she has a three-month lease. She said the short lease was the landlord's preference, but the landlord is willing to work with her, and she expects the lease

---

[2]     The caseworker did not specify what the medications are, how often they should be taken, or what happens if Mother does not take them.

will be extended. Even though her current roommate has a drug history, he told her that he does not use drugs. Mother hopes to receive the financial housing assistance the Department recommended and to apply for low-income housing.

As far as her employment, Mother testified that she left her first job for a better opportunity in IT tech. She was let go from the IT tech position, and she obtained a seasonal position. Now she is in her fourth job, working at a market research call center. Her current job allows her to pay rent and bills without issue, and she testified that she could provide for A.A. as well. As to her income, the court admitted her paystubs into evidence without objection. She said she gets paid $1,200 a month and is paid every two weeks. Mother testified that she is willing to pay child support.

Mother testified that she attends five Alcoholics Anonymous meetings a week. As to her sponsor, she explained that her current sponsor wanted to postpone meetings in person while Mother attends 90 Alcoholics Anonymous meetings in 90 days, which Mother began in August. They remain in touch.

As far as medication management, Mother said that she took medication for her mental health prior to the current case. She stopped taking the medication when she found out she was pregnant with A.A. She did not resume taking medication after A.A. was born because she was waiting for a mental health referral from the hospital. Mother testified that she did not take her medication from July to August

2025 because the dosage was too high, making it difficult to show up to work. She waited to see her psychiatrist to lower the dosage. She explained that the appointment time was delayed as she waited for Medicaid. She saw a psychiatrist on October 8, 2025, with a future appointment scheduled for the following month. She said she understood she needs her medication every day and that it is important to stay on top of it.[3] She said she is addressing her mental health so she can be well for her daughter.

As far as A.A., Mother testified that she had more than 15 unsupervised visits. She typically takes A.A. to eat and then to a park. She learned not to feed her oat milk. She knows that A.A. has some developmental challenges, and she tries to encourage her with activity. Mother testified that she does not believe termination is in A.A.'s best interest because she has complied with the Department's requests, has unsupervised visitation, and has family members willing to care for A.A. She petitioned for the child to be returned to her, but in the alternative, she would like to share custody with the Department.

### 3. Department Supervisor

The Department's supervisor testified that even though the final permanency report states the goal is reunification, the Department's goal has been unrelated

---

[3] The court admitted into evidence a photo of two prescription pill bottles in Mother's name. Mother is prescribed hydroxyzine as needed for anxiety and daily fluoxetine.

adoption or relative adoption since after the second permanency hearing. When asked about Mother's cousin who lives in New Mexico as a potential placement, the supervisor said that the Department stopped investigating this option after the first permanency hearing because Mother was doing so well completing services. After the second permanency hearing, there was another request to investigate the cousin as a placement, and it remains pending. Additionally, the supervisor said that if the parents' rights are terminated at trial, the Department would complete a home study for the paternal grandparents.

According to the supervisor, the Department seeks to terminate Mother's rights because of the instability of her mental health and her struggle to maintain stable employment and housing. The Department is concerned because of Mother's prior history of terminations and her pattern of engagement with required services. According to the supervisor, Mother did not participate in Alcoholics Anonymous meetings before October 2025, and Mother did not have stable housing with her former boyfriend. When they broke up and Mother's name was not on the lease, she did not have a place to stay. The supervisor said termination is in A.A.'s best interest because it would give her stability and a safe environment.

On cross-examination, the supervisor said that Mother's three-month lease was not considered stable, even though the landlord refused longer leases. She said the Department hopes for a six-month or longer lease. She said the Department

believes Mother restricted the caseworker's ability to gain access to the apartment, and the Department is worried about Mother's roommate. She said she did not have an answer as to whether Mother had provided three months of paystubs and she did not know why the Department had not submitted a home study for Mother's cousin in New Mexico. She said that the Department never supported Mother having unsupervised visits, and though there are no major concerns with visits, the Department is concerned about the stability of Mother's mental health and would not support continued unsupervised visitation.

### 4. Child Advocate Volunteer

The Child Advocate volunteer testified that A.A. is very bonded to her foster parents and her daycare provider. She has made progress with her developmental and physical challenges and takes swimming lessons. The volunteer recommended termination of parental rights because Mother failed to demonstrate consistency, candor, or stability. Mother said her name was on the lease for her first home visit, but it was not. The volunteer was concerned because Mother's rights to her other children were terminated for drug use, and Mother now had a roommate with a history of drug use.

### 5. Testimony of Paternal Grandfather and Foster Parents

The paternal grandfather, who only recently learned he was related to A.A., testified that he would welcome A.A. into his home. The foster mother testified

that A.A.'s foster parents hoped to adopt her and mentioned that A.A. often cries and will not sleep after visits with Mother.

**E.     Evidence at Trial**

The evidence admitted without objection at trial includes:

- Drug and alcohol test results from January to October 2025. There are one or two tests each month, and all results are negative.

- Pay stubs for Mother's current employment from September 1, 2025, through October 12, 2025.

- An Alcoholics Anonymous meeting log showing that Mother attended meetings on the following dates: August 21, 2025, two meetings on August 24, 2025, two meetings on September 15, 2025, and meetings on October 12, 13, 15, 16, and 22, 2025.

- Permanency reports to the court from April and August 2025. The April report states that Mother is in compliance with the service plan. The report orders Mother to have weekly three-hour unsupervised visitation with A.A. beginning April 28, 2025. The order states that after that, the parties will decide how to proceed. The August 2025 report states that Mother is not in compliance with the service plan, and the court orders that her visitation with A. A. will take place every other week.

- A final permanency report filed October 8, 2025, states that Mother maintains communication with the Department and demonstrates "partial cooperation with her case plan requirements" because she engages in visitation and communication but has not provided key verifications. Mother supplied a copy of her lease, but it was only valid for three months. Her new employment was verified. She reported attending a psychiatric appointment on August 22, 2025, but it was not verified. She remained "consistent in attending scheduled visitations with her daughter and continue[d] to demonstrate appropriate interactions during visits." The report stated that the Department's goal is family reunification because Mother "has demonstrated a commitment to completing all required services and addressing the issue that led to the child's removal, showing her willingness to create a safe and stable home." The Department's concurrent goal was adoption by a relative or fictive kin.[4] The report detailed Mother's progress in March, July, and October 2025 on each of her service plan goals.

---

[4] During trial, the Department's caseworker and supervisor testified that the goal section of the report was an error, and that the Department's goal had changed to adoption. The caseworker suggested that an erroneous report had been filed with the court.

**F. Closing Arguments**

In closing, the Department requested that Mother's rights be terminated based on subsection (D) and (E) based on her failure to take her medication consistently and the Department's concerns about stable housing and income. The Department argued that it was in A.A.'s best interest to have parental rights terminated so she could grow up without worrying about her inability to provide stable housing and income. The Department argued, "We need people who can be parents to this child now, not in six months, not in eight months."

Mother's attorney argued that the Department has not met its burden on termination and that it is not in A.A.'s best interest to terminate Mother's rights. Mother completed all her services. Mother's unsupervised visits since April 2025 had raised no major concerns; A.A. is bonded to her, and termination would be traumatic for the child. Mother's attorney argued that the court should choose some form of conservatorship instead of termination.

A.A.'s attorney ad litem argued that Mother has been inconsistent for the duration of the case.

**G. Termination Order**

The trial court terminated the parent-child relationship between A.A. and Mother and appointed the Department sole managing conservator. The trial court found, by clear and convincing evidence, that the Department made reasonable

efforts to return the child to Mother but that a continuing danger in the home prevented her return. The trial court further found by clear and convincing evidence that Mother (1) "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" and (2) "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E). The trial court also found that termination of the parent-child relationship was in A.A.'s best interest. Mother appealed, arguing that the evidence was insufficient to support either the predicate findings under subsections (D) and (E) or the best interest standard under section 161.001 of the Texas Family Code.[5]

**Sufficiency of the Evidence for Termination**

In a case to terminate parental rights under section 161.001 of the Texas Family Code, the Department must establish that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department

---

[5] Mother does not challenge the trial court's findings as to reasonable efforts to return the child. *See* TEX. FAM. CODE § 161.001(f).

17

must prove both elements by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

In addition, in suits brought by the Department, courts "may not order termination . . . unless the court finds by clear and convincing evidence" that "the [D]epartment made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent . . . ." *Id.* § 161.001(f).

A.    **Standard of Review**

When assessing the legal sufficiency of the evidence in a termination proceeding, we consider all the evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (discussing elevated standard of review in parental termination cases). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. When "no reasonable

factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id.*

In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* The evidence is factually insufficient if, considering the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*; *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (citing *J.F.C.*, 96 S.W.3d at 266).

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

## B. Predicate Findings under Subsections (D) and (E)

Mother challenges the factual and legal sufficiency of the evidence to support the trial court's termination of her parental rights under subsections (D) and (E) of section 161.001(b)(1) of the Texas Family Code. TEX. FAM. CODE §§ 161.001(b)(1)(D), (E). Because termination under these subsections may justify termination of parental rights to other children in future cases, we must review both grounds, even though only one ground is sufficient to support termination. *In*

19

*re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024) (citing *In re N.G.*, 577 S.W.3d 230, 235–37 (Tex. 2019)).

Section 161.001(b)(1)(D) of the Family Code provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Section 161.001(b)(1)(E) provides that the trial court may terminate a parent's rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Because evidence concerning termination under subsections (D) and (E) is interrelated, we may consolidate our examination of the evidence for both grounds. *In re A.J.H.*, No. 01-18-00245-CV, 2019 WL 190050, at *8 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.) (internal citation omitted). "Endanger" is a term used in both subsections. To "endanger" a child means exposing her to loss or injury. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (citing *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The statute does not require that conduct be directed at a child or that the child actually suffer

20

any injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). A parent's conduct that subjects "a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (internal citation omitted). The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *In re M.A.J.*, 612 S.W.3d 398, 407 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

Although both subsections (D) and (E) focus on endangerment, "they differ with regard to the source and proof of endangerment." *In re. A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (internal citation omitted). Subsection (D) concerns the children's environment, rather than the parent's conduct, although the parent's conduct can affect the children's environment. *Id.* Under this subsection, "knowingly" does not require that a parent have "certain knowledge that an actual injury is occurring." *In re. L.M.M.*, 522 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing *A.S.*, 261 S.W.3d at 83). Rather, a parent acts "knowingly" when she is aware of the potential danger but disregards that risk. *Id.* Under subsection (E), the evidence must show that the endangerment was the result of the parent's conduct, including acts, omissions, or

failure to act. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

In evaluating endangerment under subsection (D), we consider the child's environment before the Department obtained custody of the child. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied.). Under subsection (E), however, courts may consider conduct occurring both before and after the Department removed the child from the home. *Id.* (considering persistence of endangering conduct up to time of trial).

### 1. Evidence of Endangering Environment under (D)

The record reflects that A.A. was exposed to an unstable, unsafe home environment before she was removed. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 84,1 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The Department opened this case after law enforcement responded to a domestic violence incident involving Mother and her then-boyfriend. While A.A. did not suffer actual physical injury, she was present at the time of the incident and lived in the home. Endangerment includes exposing a child to potential physical or emotional or mental injury. *Boyd*, 727 S.W.2d at 533. Mother and her boyfriend argued, and when Mother attempted to stop him from leaving and tried to cut his throat with a bus card, he hit her in the face and broke her nose. Mother was

transported to the hospital with a broken nose. When Mother needed to be admitted for psychiatric stay, she did not have social support to care for infant A.A. Mother admitted that she previously struggled with drug abuse that led to termination of her rights to five other children. The record supports the conclusion that, at the time of removal, Mother had exposed A.A. to endangering conditions by knowingly placing or allowing A.A. to be in surroundings that endangered her physical or emotional well-being.

## 2. Evidence of Endangering Conduct under Subsection (E)

In addition to conditions and conduct before removal as described above, the record reflects that Mother's housing arrangement remained unstable throughout the pendency of the case. Once she left the hospital, Mother returned to live with the boyfriend involved in the initial domestic violence incident. The caseworker testified that she tried to advise Mother that housing problems could arise if they broke up because Mother's name was not on the lease, and indeed, when they broke up, Mother did not have a place to live. Although she obtained a three-month lease, Mother's roommate had a history of prior drug use, and this concerned the Department because Mother herself had struggled with drug addiction in the past. Even though Mother testified that the landlord would work with her and only offered short term leases, the length of the lease did not signal stability in the Department's opinion. Mother's decision to move back in with her boyfriend after

he broke her nose in A.A.'s presence and her failure to obtain and maintain stable housing during the pendency of the case was a factor demonstrating that Mother could subject A.A. to a life of uncertainty and instability, endangering her physical and emotional wellbeing. *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *7 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (concluding Mother's inability to provide stable housing and a consistent home environment was endangering conduct under subsection (E)).

Mother also acknowledged mental health issues that required medication. Mother admitted that she had stopped and started her medications, including not taking the medication for multiple months during the pendency of the case. While mental illness alone is not grounds for terminating the parent-child relationship, untreated mental illness can expose a child to endangerment and is a factor that the court can consider. *In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at *15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (considering a parent's failure to take medication to treat mental health issues as factor in creating environment that endangers child's emotional or physical well-being); *J.I.T.P.*, 99 S.W.3d at 845 (considering parent's mental health and noncompliance with her medication schedule as factors in endangering child).

Mother argues that the evidence suggests that she was in substantial compliance with the services she was ordered to complete. The parties agreed that

24

Mother completed many services, including parenting classes, domestic violence classes, and several evaluations and resulting therapeutic recommendations. Mother also tested negative for drugs throughout the case. Yet, the record also supported a finding that Mother did not obtain long-term housing and did not adequately address her mental health by regularly taking medication.

Reviewing all the evidence in the light most favorable to the termination findings under subsections (D) and (E), we conclude that a reasonable factfinder could have formed a firm belief or conviction as to the truth of the finding that Mother engaged in endangering conduct and exposed A.A. to endangering conditions. In light of the entire record, a reasonable factfinder could have credited the disputed evidence in favor of these termination findings. As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of Mother's testimony. We hold the evidence is legally and factually sufficient to support the predicate termination findings under subsections (D) and (E).

We overrule Mother's first two issues.

## C. Best Interest

Mother contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in A.A.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(2) (requiring that trial court find

25

that termination is in best interest of child). There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012 no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a). Because of the strong presumption in favor of maintaining the parent-child relationship and the due-process implications of terminating a parent's rights to her minor child without clear and convincing evidence, "the best interest standard does not permit termination merely because a child might be better off living elsewhere." *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (internal quotations omitted). Additionally, in a parental-rights termination suit, the Department bears the burden of proving, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever. *In re. D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3)

the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the stability the home or proposed placement; (8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on each factor to support a finding that terminating a parent's rights is in the child's best interest. *Id.* Moreover, evidence supporting termination under one of the grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both section 161.001(b)(1) grounds and best-interest finding).

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of

27

the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and protection from repeated exposure to violence even though the violence may not be directed at the child; whether an adequate social support system consisting of an extended family and friends is available to the child; and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 236.307(b).

The factfinder may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.A.P.*, No. 01-24-00934-CV, 2025 WL1460737, at *25 (Tex. App.—Houston [1st Dist.] May 22, 2025, no pet.) (mem. op.). A parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See id.* A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *Id.*

1. **Application of the Holley Factors**

(1) **Desires of the Child**

At the time of trial, A.A. was about sixteen months old, and no direct evidence was presented of her desires. In general, when a child is too young to

express herself, this factor is neutral in our analysis. *In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.). In some cases, we have held that circumstantial evidence of a child's bond with a foster family in the absence of a bond with a parent may support termination. *Id.* In this case, A.A. had regular contact with Mother, who had unsupervised visitation for months before trial. The evidence showed that A.A. had a bond with both Mother and the foster parents. This factor is neutral in our analysis. *See id.*

### (2) Present and Future Physical and Emotional Needs of the Child; Present and Future Emotional and Physical Danger to the Child

*A.A.'s Needs*

While some have extraordinary needs, all children have physical and emotional needs that must be met daily. *In re C.G.*, No. 14-18-00412-CV, 2018 WL 4702403, at \*5 (Tex. App.—Houston [14th Dist.] Oct. 2, 2018, pet. denied) (mem. op.) The record reflects that A.A.'s needs included additional support or therapy for walking and talking. She was thriving and with this additional support, and she was catching up in milestones. Mother testified that she was willing to support A.A.'s continued advancement.

The Department presented no evidence that Mother could not meet A.A.'s therapeutic needs, or that termination of Mother's parental rights would improve the outlook for A.A.'s needs. *See M.A.J.*, 612 S.W.3d at 412 (holding evidence insufficient to support trial court's finding termination of parental rights in child's

best interest where no evidence presented that child's needs would go unmet if returned to parent's care); *In re D.D.M.*, No. 01-18-01033, CV, 2019 WL 2939259, at *6 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.) (holding because no evidence contradicted parent's testimony that he was able to mitigate emotional and physical danger stemming from child's mental-health issues, this factor weighs against termination under factual-sufficiency analysis).

*Danger to A.A.*

Mother exposed A.A. to domestic violence during the removal incident, though A.A. was not physically harmed. Mother returned to living with the man involved in the domestic violence incident once she was released from the hospital. He also participated in services with the Department until they broke up. Mother was not taking her psychiatric medication at the time of the incident and did not regularly take the medication during the pendency of the case. Mother also testified that her roommate at the time of trial had previous drug issues, and Mother's rights to other children had been terminated for issues related to drug abuse. The record also reflects that Mother tested negative for drug and alcohol use during the pendency of the case. Despite Mother's substantial life changes during the pendency of the case, a reasonable factfinder could have inferred from Mother's pre-removal behavior that she may fail to protect A.A. again in the future. *See*

*E.A.P.*, 2025 WL 1460737, at *25 (noting parent's past conduct is probative of future conduct in best-interest evaluation).

Given the domestic violence involved in the pre-removal conduct, this factor weighs in favor of termination.

### (3) Parental Abilities of the Persons Seeking Custody and the Stability of the Home or Proposed Placement

The evidence at trial reflected that since A.A.'s removal, Mother completed the Department's required services and programs. Mother was regularly employed throughout the pendency of the case, though her job changed. Mother completed parenting classes, domestic violence classes, drug testing, individual therapy, intensive outpatient substance abuse treatment, and several psychological and psychosocial evaluations and their recommendations. Mother attended Alcoholics Anonymous meetings, though her regular attendance was disputed. The Department did not think that Mother's three-month apartment lease satisfied the stable housing requirement. She told the caseworker that the landlord would not offer a longer lease but that the landlord was willing to work with her to maintain the apartment, and she was willing to look for other housing with a longer lease. There was no evidence in the record on the condition of Mother's home either before A.A. was removed or at the time of trial. The Department also had concerns about the housing because Mother's roommate had a prior drug history. The caseworker testified that Mother prevented the Department from accessing the

31

housing or interviewing the roommate, although the final report to the court says she gave the Department the roommate's name and social security number.

The service plan also required Mother to increase her social support network. The record at trial does not show that Mother had any local family to call on for support, and the maternal grandmother was unable to care for A.A. Mother felt her mother and brother were supportive of her, though they did not live locally.

As described supra, Mother admitted that she did not take her medication regularly during the pendency of the case and was not taking the prescribed medication at the time A.A. was removed. The caseworker testified that in the summer before trial, she contacted Mother's pharmacy, and Mother had not been regularly filling her monthly prescriptions. Mother had been compliant with her medication only in the month before trial. The record contains a photo of two pill bottles in the record, showing that Mother takes fluoxetine daily and hydroxyzine as needed, but it does not explain what the medication is, the condition it treats, and what happens if it is not taken regularly. The record does not show how Mother's medication management impacted A.A., other than that Mother was referred for an inpatient mental health program after the domestic violence incident.

Mother attended nearly all visitations with A.A. She remained bonded to A.A. by attending visits.[6] Beginning in April 2025, Mother had three-hour unsupervised visits with A.A. The frequency decreased to every other week in August 2025 because the foster parents informed the Department that A.A. was upset after visits. There was no testimony, however, that Mother's behavior at any visit was inappropriate or endangering. Mother agreed to provide child support and to continue working services offered by the Department. Mother also agreed to assist A.A. in any therapy necessary to continue her milestone development. During the pendency of the case, she cooperated by completing the services required of her. Mother was willing to work with the foster family to maintain contact with A.A. if the child was not returned to her care, but Mother's parental rights were not terminated.

The record shows that the foster parents had shown exemplary care and love to A.A., providing for her needs and helping her to thrive under their care.

The clear-and-convincing evidence relevant to these factors shows that while the foster parents could meet all of A.A's needs in a stable home, Mother was able

---

[6]     Although the child advocate and caseworker reference previous hearings, specifically one previous hearing that led to reduced visitation for Mother, none of the previous hearings constitute evidence that can support the trial court's order terminating parental rights and finding that termination was in the best interest of the child as the records from these hearings were not admitted at trial.

to meet some but not all of A.A.'s needs. This factor does not weigh in favor of irrevocably terminating Mother's rights.

### (4) Programs Available to Assist Those Persons Seeking Custody in Promoting the Best Interest of the Child

Mother expressed her willingness to abide by court orders and to complete additional services offered by the Department to promote the best interest of A.A. Mother also completed all the service programs required and offered to her. The Department argued that Mother did not have stable housing because she had a short lease and that Mother's employment was unstable because she changed jobs multiple times. The record reflects that Mother was regularly employed throughout the pendency of the case, and though her job changed, the Department verified each employer. At the time of trial, Mother was employed and provided recent paystubs to verify her employment.

This factor does not weigh in favor of termination.

### (5) Plans for the Child by the Individuals or Agency Seeking Custody

The record shows that at least until a short time before trial, the agency's goal for A.A. was family reunification with Mother. At the final permanency hearing immediately preceding trial, the agency's goal changed to placing A.A. in an unrelated adoption with a concurrent goal of family adoption. The record reflects that the foster parents were interested in adopting A.A. The paternal grandparents and Mother's cousin had not been ruled out as familial placements.

34

This factor is neutral in our analysis.

**(6) Acts or Omission of the Parent that May Indicate the Existing Parent-Child Relationship is Not Appropriate and Any Excuse for the Parent's Acts or Omissions**

Mother's pre-removal behavior, her continued sporadic compliance with medication management, and her initial return to the partner who was part of the domestic violence incident, may indicate that the existing parent-child relationship is not appropriate. Mother explained that her lack of medication was due to inability to get an appointment with her doctor to change her dosage. At the same time, the evidence includes that Mother, even when not taking the medication, was appropriate during unsupervised visitation with A.A. She completed numerous classes and services through the Department, and her drug testing results reflect that she abstained from drugs and alcohol. Mother attended Alcoholics Anonymous meetings and had a sponsor. She provided the sponsor's information to the Department, but the Department did not verify it. Mother testified that she was not meeting in person with the sponsor at the time of trial because she was completing 90 meetings in 90 days.

This factor weighs slightly in favor of termination.

**2.     Family Code Section 236.307(b) Factors**

Additionally, the record reflects that Mother had a history of substance abuse and chose to live with a roommate who also had previous drug issues.

Mother was willing to seek out, accept, and complete counseling services, and she cooperated with and facilitated the Department's supervision. She was willing to effect positive personal changes and demonstrated adequate parenting skills. She also demonstrated a reasonable understanding of A.A.'s needs and capabilities. The evidence was disputed whether her home was a safe physical home environment for A.A. due to her roommate. There was no evidence regarding the physical condition of her home. *See* TEX. FAM. CODE § 236.307(b).

### 3. Considering the Record as a Whole

The record reflects that A.A. was about sixteen months old at the time of trial. She was removed from Mother's home when she was four months old, following a domestic violence incident. Mother admitted she had drug issues in the past. During the case, Mother completed numerous services and programs through the Department. She abstained from drugs and alcohol, participated in Alcoholics Anonymous, was employed, obtained an apartment, and could financially support herself. Mother had unsupervised visitation with A.A. for months before trial.

The Department's argument in favor of termination being in the best interest of A.A. rests primarily on disapproval of the length of Mother's lease, its belief that her employment was unstable, concerns with inconsistent medication management, and lack of communication with her Alcoholics Anonymous sponsor. While these details suggest that Mother was not ready to have physical custody of

A.A., the Department's burden was not to simply prove Mother should not have custody of A.A. Its heightened burden was to prove, by clear and convincing evidence, that it is not in A.A.'s best interest to have any legal relationship with Mother whatsoever. *See In re J.A.J.*, 243 S.W.3d 611, 616–17 (Tex. 2007) (distinguishing conservatorship from termination). The evidence must therefore permit a reasonable factfinder to form a firm conviction or belief that Mother should no longer be in A.A.'s life as her mother, not merely that she should not have custody. *See id.* at 616.

Considering the evidence in the light most favorable to the court's finding, and disregarding the reasonable inferences from the undisputed evidence that do not support the court's finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's rights was in A.A.'s best interest. This conclusion rests primarily on Mother's pre-removal behavior. We conclude that the evidence is legally sufficient to support the court's finding.

When we consider the entire record, however, including the evidence that cannot be credited to the trial court's finding, we cannot conclude that the evidence is factually sufficient to support the trial court's finding on best interest. We consider the evidence that Mother remained drug and alcohol free, was employed, obtained housing, complied with the service plan, cooperated with the Department,

regularly visited A.A. and maintained a bond with her, and completed all required classes, therapies, and evaluations. At the time of trial, Mother was compliant in her medication management. The record is at best vague as to what medication Mother is taking, what condition it treats, and what the risks of not taking it regularly are. There is no evidence that Mother's lack of medication impacted her or A.A. during unsupervised visits with A.A. Mother had future appointments to continue seeing her psychiatrist. She was also regularly attending Alcoholics Anonymous meetings.

The caseworker testified that she was "unsure" if Mother could attend to A.A.'s therapy needs and disapproved of the length of Mother's lease. She also testified that the Department would not support expanded visitation, but the record does not reflect that A.A. was in danger or harmed during unsupervised visitation. The caseworker's opinions are conclusory and even if uncontradicted, amount to no more than a scintilla of evidence. *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.— San Antonio 2013, no pet.).

The Department also seeks termination because it did not make contact with mother's Alcoholics Anonymous sponsor, did not approve of the length of her lease, and felt that her medication management was poor. While these aspects may demonstrate that Mother is not ready to have custody of A.A., a reasonable factfinder could not have formed a firm belief or conviction that termination of

Mother's rights—meaning she will have no relationship with A.A. at all—was in A.A.'s best interest. *See In Re H.S.*, No. 24-0307, slip op. at 31 (Tex. June 5, 2026) ("The [predicate acts and best interest] subsections are distinct—and require distinct scrutiny at all stages of the judicial process—because it may well be in the child's best interest to remain connected with the parent even after the parent has committed one of the actions described in [TEX. FAM. CODE § 161.001(b)(1)]. That outcome may be especially likely when, as here, the parent is on the path to rehabilitation and reunification.")

The Department failed to carry its burden to demonstrate by clear and convincing, factually sufficient evidence that termination of Mother's rights to A.A. was in A.A.'s best interest. *See* TEX. FAM. CODE § 161.001(b)(2). Because we hold that the evidence is factually insufficient to support the trial court's best interest finding, we reverse that part of the trial court's decree that terminated Mother's rights to A.A.

## Conclusion

We reverse the trial court's decree terminating Mother's rights to A.A., and we remand this case to the trial court for a new trial.


Susanna Dokupil
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.